**NATIONAL LABOR RELATIONS BOARD**

v.

**ALASKA S. S. CO. et al.**

**No. 13559.**

United States Court of Appeals,
Ninth Circuit.
Feb. 26, 1954.

---

George J. Bott, Gen. Counsel, David P. Findling, Assoc. Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Marcel Mallet-Prevost, Thomas J. McDermott, Washington, D. C., Thomas P. Graham, Patrick Walker, Seattle, Wash., for petitioner.

Bogle, Bogle & Gates, J. Tyler Hull, Seattle, Wash., Jay A. Darwin, San Francisco, Cal., Bassett & Geisness, John Geisness, Seattle, Wash., for respondent.

Before DENMAN, Chief Judge, and STEPHENS and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order issued against Alaska Steamship Company (hereafter the Company) and American Radio Association, CIO (hereafter the Union).

The order proceeds on findings that the Company violated § 8(a) (3) and (1) of the Act by discriminatorily denying employment to one Horace Underwood, and that the Union violated § 8(b) (1) (A) and (2) by causing the Company to do so. The Company is a member of the Pacific Maritime Association and was a member of its predecessor, Pacific American Shipowners Association, referred to in the record as PASA. In December of 1948 PASA and the Union executed a bargaining agreement under which members of the PASA (including, of course, the Company) agreed among other things that the offices of the Union should be the central clearing bureaus through which all arrangements in connection with the employment of radio officers should be made, and that when filling vacancies preference of employment was to be given to members of the Union.

Upon the making of this contract the Union adopted rules and procedure for carrying it into effect with respect to the assignment of radio officers to job vacancies. In summary, the Union maintained an assignment list which was open to Union members only. To obtain a

place on the list a member was required to file an application with the union stating the port from which he wished to ship. If the application was accepted, the member would then be placed on the list and designated as available for employment for the port specified. Job vacancies were filled from the list in accordance with principles of rotary hiring, which functioned in the manner following: When a member company of the Association needed a radio officer it would notify the local office of the Union that a job was available at a specified port. The local office would then offer the job to the active member who had signed for that port and whose number was lowest in numerical order on the list. If the member accepted the job he would be issued clearance by the Union; otherwise the offer was repeated until the local office secured a member of the Union who would accept the job. (A vacancy could be filled from outside the list only in the event that nobody on it would accept the job.) Thereafter for each week of employment an employed member's number on the list was increased by 30, thereby causing him to move toward the bottom of the list, while unemployed members were progressing toward the top.

In March 1949 Underwood, who is a qualified radio officer, joined the Union and was placed on the latter's assignment list as an active member for the Port of Seattle, from which the Company operated its ships. Thereafter he accepted referrals to the Company and was employed on several of its vessels until late in November 1949, at which time he again registered as unemployed and was placed on the Union's list.

Underwood was dissatisfied with the system of rotary hiring, feeling that it prevented a radio officer from obtaining permanent employment and acquiring seniority status with one employer; and he was interested only in employment with the Company. Therefore on December 28, 1949, he resigned from the Union, and the latter accordingly removed his name from its list.[1] After resigning he made attempts to obtain employment directly with the Company, but the latter refused his applications on the ground that it hired through the Union only. On March 29, 1950 the Company wrote the Union requesting it to treat Underwood "without discrimination as to union or non-union affiliation." The Union replied that Underwood had been listed for employment and that there would be no discrimination against him. However, it did not in fact restore Underwood's name to its assignment list. As of May 5, 1950 Underwood had not obtained employment with the Company. On that date a vacancy occurred in the position of assistant radio officer aboard the Company's ship Alaska, a position which the Board and the trial examiner (on ample evidence) found Underwood would have accepted had it been offered to him. The Company notified the Union of the opening, but the Union referred one Deyo, not Underwood, to fill it. While the respondents dispute the point, it was fairly established that had Underwood's name remained on the assignment list he would, in line with the Union's shipping rules, have occupied a preferred position over Deyo,[2] a member of the Union, and was therefore entitled to referral ahead of Deyo. However, the position was filled by the Union's referral of Deyo.

On the basis of the foregoing the Board found that the provisions of the 1948 agreement, granting preference in hiring to members of the Union, were illegal inasmuch as they ran counter to the limited union-security conditions permitted by § 8(a) (3) of the Act.[3] It found that, pursuant to the preferential

---

1. The last date on which Underwood's name appeared on the list was January 7, 1950.

2. That is, he would have had on the list a lower number than Deyo and thus would have been entitled to the job.

3. In an earlier proceeding, Pacific Maritime Association, 89 N.L.R.B. 894 [April 28, 1950], the Board had held that the execution of the 1948 agreement was vio-

hiring provisions of the agreement, Underwood was denied employment with the Company because he had resigned from membership in the Union. On these findings the Board concluded that the Company discriminated against Underwood in violation of § 8(a) (1) and (3) of the Act, and that by causing the Company to do so through the illegal hiring agreement the Union violated § 8(b) (2) and (1) (A). It further determined that the removal of Underwood's name from the assignment list constituted in itself discrimination against Underwood, in violation of § 8(a) (1) and (3) by the Company and § 8(b) (2) and (1) (A) by the Union.

[1] The Union's removal of Underwood's name from the assignment list was entirely in keeping with its shipping rules, which, as seen, provided for the listing of members only. The Board's determination that his name was dropped on that consideration alone is substantially supported by the evidence. And its further conclusion that the Company knew Underwood had resigned and knew that his name had been removed from the list because of his ceasing to be a Union member is likewise supported, notwithstanding the Company heatedly contends the contrary.

[2] By May 5, 1950, at any rate, both the Union and the Company were on notice that the 1948 agreement was illegal. See note 3 above. The Company attempts to absolve itself of responsibility by stressing its earlier request that the Union waive the illegal union-preference feature as regards Underwood. Considering all the circumstances the request would seem to have amounted to little more than the expression of a pious hope. The Union, as might have been anticipated, ignored the request and adhered to the agreement. We think with the Board that the Company, having entered into and maintained the illegal preference contract, is in no position to assert that in a particular case it did not know that the discriminatory purpose was being carried out.

[3] One feature of the remedy recommended by the trial examiner and approved by the Board should be noticed, namely the requirement of lost pay to Underwood, imposed by the order jointly on the Union and the Company.[4] We are of opinion that back-pay computation may not include losses accruing to a worker through his willful refusal of equivalent employment. The record indicates that certain jobs of equivalence were refused by Underwood for the reason that they were not with the Company. The proposed award for losses accruing to him in the period commencing with the year 1951 appears to assume that Underwood would have stood by awaiting the recommencement of operations by the Alaska, the Company ship on which he was discriminatorily denied employment on May 5, 1950. The respondents tell us that usually all radio operators did not stand by after the outbreak of the Korean war when employment for radio operators became relatively plentiful.

The Board has not discussed this subject here, either in brief or oral argument. Naturally no determination of the amount of lost pay flowing from the discriminatory treatment of Underwood has yet been made. Our purpse here is to

---

lative of § 8(a) (1) because of the illegal preferential hiring provisions.

The 1948 agreement remained in effect until July 1950, when it was replaced by a new agreement between Pacific Maritime Association, PASA's successor, and the Union, which, although retaining the hiring-hall provision, omitted the preferential hiring clause and provided that the Union would not discriminate against nonmembers in job referrals. The 1950 agreement is not, of course, involved

here, the allegedly unfair labor practices having occurred under the 1948 agreement.

4. The Company appears to contend that joint liability cannot, under the terms of § 10(c), be imposed. This court has held the contrary. N. L. R. B. v. Pinkerton's Nat. Detective Agency, 9 Cir., 202 F.2d 230, 231–232. Cf. also Radio Officers' Union of Commercial Telegraphers Union, A. F. L. v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323.

express for the benefit of the Board our view that the worker discriminated against is under the necessity of mitigating his loss.

Our decree enforcing the Board's order will be subject to the condition that after the award of back pay has been made exceptions to it on the grounds indicated will be entertained by the court.

Subject to this condition a decree will be entered enforcing the order.