### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### NATIONAL FOOD STORES, INC., Respondent.

### No. 14416.

United States Court of Appeals
Seventh Circuit.
May 27, 1964.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Atty., N. L. R. B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Anthony J. Obadal, Atty., N. L. R. B., for petitioner.

O. S. Hoebreckx, Milwaukee, Wis., Sidney M. Libit, Chicago, Ill., for respondent.

Before HASTINGS, Chief Judge, and DUFFY and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This case is here on petition of the National Labor Relations Board, pursuant to Sec. 10(e) of the National Labor Relations Act (29 U.S.C. § 151 et seq.) (called the Act), for enforcement of its order issued against National Food Stores, Inc. (respondent) April 29, 1963, and reported at 142 NLRB No. 38.

Respondent is a Michigan corporation engaged in the sale of groceries at retail stores in numerous states. There are thirteen divisions in respondent's organization, with home offices in Chicago, Illinois. The unfair labor practices found to have been committed herein involved the Milwaukee division which operates fifty-seven stores, twenty-seven located in Milwaukee County and thirty in other parts of Wisconsin and in Michigan.

On March 26, 1962, the Union (Office Employees International Union, Local No. 9, AFL-CIO) filed a representation petition with the Board seeking certification as the bargaining agent of respondent's five Milwaukee field auditors, whose function was to take inventory in stores operated by respondent. On April 26, 1962, respondent and the Union entered into a stipulation consenting to an election whereby the parties agreed, inter alia, that the inventory personnel constituted an appropriate collective bargaining unit. On May 11, 1962, the election was held, which resulted in an unanimous vote for the Union. On May 22, 1962, the Board certified the Union as the bargaining representative of the employees of the unit.

After hearing, a trial examiner, on February 14, 1963, issued his Intermediate Report, finding that respondent had engaged and was engaging in certain unfair labor practices, and recommending

that it cease and desist therefrom and take certain designated affirmative action. On consideration of the examiner's Report and respondent's exceptions thereto, the Board adopted the trial examiner's findings, conclusions and recommended order.

The Board's conclusions which in the main form the basis for the contested issues here are: (1) that respondent violated Sec. 8(a) (1) of the Act by interrogating all the clerks concerning their reasons for joining the Union, by threatening some with discharge, transfer to distant locations, replacement with other employees and contracting away their work, and by promising some promotions and other benefits if they voted against the Union; (2) that respondent violated Sec. 8(a) (3) and (5) of the Act by discontinuing its inventory system and by subcontracting the inventory work to an independent contractor because the field auditors had selected the Union as their bargaining representative, and (3) that regardless of respondent's motives in deciding to subcontract the work, respondent violated Sec. 8(a) (5) by unilaterally taking this action without bargaining with the Union concerning its decision in this respect.

The Board's order requires respondent to cease the unfair labor practices found, to reinstate the field auditors to their former positions and to make them whole for any loss of pay they may have suffered as a result of the discrimination against them. Respondent is also required to bargain with the Union on request and to post the appropriate notices.

We need not relate in detail the evidence relied upon by the Board in support of its conclusion that respondent violated Sec. 8(a) (1) of the Act, inasmuch as its sufficiency is not seriously challenged. Respondent upon learning of the intention of the field auditors to organize went beyond any permissible limit in demonstrating its opposition. The employees were told in effect that as members of a' union they could not participate in respondent's profit-sharing program and that their increase for sick benefits would

not be allowed, that respondent would not tolerate a union in the inventory unit, that it did not intend to have the crew organized and would fight it in every way, and that such a union would be a failure. They also were told that if they persisted in the union movement respondent had numerous alternatives which it could employ, including transferring inventory personnel to distant points from Milwaukee, changing working hours, laying off field auditors, taking inventory with store and supervisory personnel or subcontracting the inventory work to an outside firm.

██ Pending the representation proceedings before the Board and prior to the election (May 11, 1962), each of the five employees was interviewed by management and promised a better job if he voted against the union. True, the testimony of the five employees was contradicted in some respects by witnesses for the respondent. It is hardly necessary to cite cases in support of the rule that the issue of credibility is a matter for resolution by the Board. See Revere Copper and Brass, Inc. v. N. L. R. B., 7 Cir., 324 F.2d 132, 135, and Revere Camera Corp. v. N. L. R. B., 7 Cir., 304 F.2d 162, 164 (both decisions by this Court), and cases therein cited.

The Board's finding that respondent violated Sec. 8(a) (3) and (5) of the Act by subcontracting its inventory work to an independent contractor because the field auditors had selected the Union as their bargaining agent presents a more difficult problem. Closely allied with this issue is that arising from the Board's finding that respondent violated Sec. 8(a) (3) and (5) by contracting out its inventory work without bargaining with the Union. Respondent argues (1) that its decision to subcontract its inventory work was for economic reasons only and not because of the Union organization, and (2) that in any event it attempted in good faith to bargain with the Union concerning its subcontracting of the work.

After certification of the Union as the bargaining agent, meetings were held be-

tween representatives of the Union and respondent, purportedly for the purpose of bargaining. The first meeting, July 17, 1962, was a few weeks after respondent had received from Union officials a proposed contract. At the second meeting, August 17, 1962, the company announced that it would subcontract the inventory work and place such employees elsewhere with the company or recommend them to the subcontractor. In the meantime, respondent had obtained from Retail Grocery Inventory Service (RGI) a proposal for performing its inventory work, which was accepted by respondent September 4, 1962. As we shall later show in some detail, the Union refused to accept respondent's offer of other jobs to its members and, on September 16, the inventory work was taken over by RGI.

■ The evidence relied upon by the respective parties upon the issue as to whether respondent's decision to subcontract its inventory work was discriminatory or solely the result of respondent's economic situation presents a close question even when approached from the standpoint of our prerogative as a reviewing court. We think it is sufficient to state, without detailing such evidence, that we have carefully considered it and have reached the conclusion that there is sufficient basis for the Board's finding that respondent's action was discriminatory.

■ In evaluating respondent's motive in making the change, it is difficult to escape the inference arising from its strenuous opposition to the unionization of its inventory clerks as evidenced by its statements and activities prior to the election at which the employees voted for the Union as their bargaining representative. Respondent's attempt to counteract this unfavorable inference is not without merit. It points out that it and its affiliates had contracts with some twenty-five labor unions and that its reason for opposition to the unionization of its inventory clerks was the nature of their work, different from any other category of employees. This difference re-

sulted from the fact that inventory clerks could perform their services in a more efficient manner by working after hours and week-ends when there were no customers in the stores. Thus, the hours of their employment had long been a matter of controversy. Respondent argues that it feared greater difficulty in this respect if it was required to deal with the Union. That this fear was not without basis is shown by the contract which the Union proposed at the first meeting with respondent subsequent to the Union's certification. On the other hand, it is a circumstance from which a reasonable inference can be drawn against respondent that its decision to subcontract its inventory work was made only when faced with the obligation to bargain with the Union. Moreover, respondent would be in violation if the selection of the Union by the clerks was a contributing factor in its decision to subcontract the work. Town & Country Mfg. Co., Inc. v. N. L. R. B., 5 Cir., 316 F.2d 846, 847; N. L. R. B. v. Great Eastern Color Lithographic Corp., 2 Cir., 309 F.2d 352, 355; N. L. R. B. v. Whitin Machine Works, 1 Cir., 204 F.2d 883, 885; Butler Bros. v. N. L. R. B., 7 Cir., 134 F.2d 981, 985.

■ Respondent contends that irrespective of its motivation it did not violate Sec. 8(a) (3) and (1) because it did not "discharge" the employees, as alleged in the complaint, until they rejected the transfer to other jobs. We shall later discuss the circumstances relevant to the rejection by the employees of other jobs in connection with another issue. Agreeing with the Board that respondent's action in contracting out the auditors' work was discriminatory, it follows that the employees' jobs were wrongfully eliminated. Certainly that was an action in regard to their "tenure of employment." Whether the result may be properly characterized as a "discharge" is immaterial. The fact is that their jobs were eliminated and their employment as to those jobs ceased. This was a violation of Sec. 8(a) (3).

We hold that the Board's findings that respondent violated Sec. 8(a) (3), (5)

and (1) of the Act are substantially supported.

The Board found that respondent violated Sec. 8(a) (5) of the Act by its refusal to bargain with the Union prior to the making of its decision to subcontract the inventory work to an independent firm. This contention is admittedly dependent on the Board's subsidiary finding that the decision to subcontract unit work is a mandatory subject of bargaining. The Board asserts that this duty rested upon respondent irrespective of its motive in subcontracting the work.

There is much controversy as to whether respondent bargained with the Union on this issue and, if not, which of the parties was responsible for not doing so. As the Board concedes, there is a conflict in the cases as to whether respondent was obligated to bargain on the subcontracting issue under the instant circumstances. East Bay Union of Machinists, Local 1304 United Steelworkers of America, A.F.L.-C.I.O. v. N. L. R. B., 116 U.S. App.D.C. 198, 322 F.2d 411, 414, has held in the affirmative and certiorari has been granted by the Supreme Court, 375 U.S. 974, 84 S.Ct. 491, 11 L.Ed.2d 420. N. L. R. B. v. Adams Dairy, Inc., 322 F.2d 553 (C.A.8), has held to the contrary, with petition for certiorari pending. See also opinion of this Court in Jays Foods, Inc. v. N. L. R. B., 7 Cir., 292 F.2d 317.

The Board concludes its discussion of this issue with the suggestion that this Court "may wish to enforce the order on the basis of the discriminatory termination of all employees to avoid any bargaining * * * without necessarily deciding the question of whether subcontracting is a mandatory subject of bargaining." We agree with this suggestion, in view of the fact that a decision of the issue is not necessary in order to support the Board's order, and particularly with the issue now pending in the Supreme Court.

We now consider respondent's contention that the inventory clerks are not entitled to be reimbursed for any wage loss incurred as a result of their concerted refusal to accept substantially equivalent employment. This contention is based upon the Board's order as recommended by the trial examiner, "that the respondent be ordered to make whole each of the five clerks for any loss of earnings he may have suffered in consequence of the illegal discharges, with interest upon any money due."

As already noted, the Board found that respondent refused to bargain with the Union relative to its action in subcontracting the inventory work. The Board concedes that respondent offered to bargain concerning the effect of its decision, that is, as to the placement of the inventory clerks in other jobs, which offer they refused. The examiner in his Report stated:

"The conference [referring to the meeting of August 17, 1962] ended with the Company representatives again reassuring Lewandowski [International representative of Union] and the clerks present of the Company's desire to interview each of the five clerks in order to offer them jobs elsewhere with the Company. The Union said the matter would be discussed with all five clerks perhaps later that day, and that Lewandowski would advise the Company whether or not the clerks were willing to be interviewed on that basis.

"Lewandowski met with all five clerks in the union office later that day, and as a group they decided against presenting themselves for the individual interviews desired by the Company. Lewandowski did not communicate with the Company representative again. A week or two later both Cloverdale [respondent's personnel manager] and Quirk [respondent's labor relations director] telephoned Lewandowski's office in order to learn what the Union's position might be. Lewandowski learned of their calls but never called back."

On August 29, the Company wrote a letter to each of the five clerks, inviting him to an interview in the office of the

personnel manager. The examiner found, "Each clerk came as invited, was offered employment elsewhere with the Company—without the parties reaching definitive understanding as to precisely what job they should do—, and in each instance the clerks indicated unwillingness to accept other kind of work with the Company." The clerks continued on their jobs until September 16, when their work was taken over by employees of the independent contractor.

We need not prolong this discussion with a detailed description of the jobs offered to the employees, but it is sufficient to state that each was offered continued employment with respondent in white collar jobs at the same or better salaries, under Union contract conditions. It may be true, as the examiner found, that the parties did not reach a "definitive understanding as to precisely what job they should do," but, if so, it was the employees' fault and not that of respondent. As the examiner found (see quotation above), the five employees, after the meeting of August 17, met as a group and decided against accepting any other employment with respondent. That was their position when they met with respondent on August 30, and they showed no interest in learning more about the jobs which they were offered.

▉ The examiner in discussing this issue states, "Conceivably, in the context of a dispute over an employer's right to discharge an employee, an offer of equivalent interim employment pending legal resolution of the labor dispute and for the purpose of minimizing damages that might result from a good-faith misconception of employer privileges under the statute, could equitably be a factor in determining backpay liability. Such was not the case here." We think to the contrary. The fact that respondent was found guilty of an unfair labor practice in the manner heretofore shown furnishes no basis for the contention that it did not act in good faith. It made a strong showing that it subcontracted its inventory work for economic reasons rather than for the purpose of discrimination. Certainly it evidenced no bad faith in its refusal to bargain with the Union prior to its decision to subcontract when the courts do not agree on its duty in that respect.

The Board cites three cases in support of its contention that the employees were not required to accept "discriminatory jobs." N. L. R. B. v. Poultrymen's Service Corp., 3 Cir., 138 F.2d 204, 211; N. L. R. B. v. Armour & Co., 10 Cir., 154 F.2d 570, 571, 169 A.L.R. 421, and N. L. R. B. v. Goya Foods, Inc., 2 Cir., 303 F.2d 442, 443. A reading of these cases reveals that on the facts of the case they furnish little, if any, support to the Board's contention. In the first place, there is no proof that the jobs offered by respondent were discriminatory; in fact, as shown, it indicates that they were not inferior to the inventory jobs. Secondly, the employees, as shown, prior to the job offers met and agreed that they would not accept other employment, discriminatory or otherwise. Not only did they in concert agree to refuse any other employment but they also refused even to discuss the matter with respondent.

In Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 178, 61 S.Ct. 845, 85 L.Ed. 1271, the Court found the employer guilty of an unfair labor practice for its refusal to hire applicants for employment solely because of their affiliation with a labor union. As a part of its remedial action, the Board had ordered that the workers who had been denied employment be made whole for their loss of pay, less their earnings from the date of the discrimination. The Court of Appeals modified the order to include not only their loss of pay but amounts which the workers "failed without excuse to earn." The Supreme Court overruled the Board's challenge to this modification and stated (313 U.S. page 198, 61 S.Ct. page 854):

"Since only actual losses should be made good, it seems fair that deductions should be made not only for actual earnings by the worker but also for losses which he willfully incurred."

On the same page, the Court stated:

"The remedy of back pay, it must be remembered, is entrusted to the Board's discretion; it is not mechanically compelled by the Act."

See also N. L. R. B. v. Alaska S.S. Co. et al., 9 Cir., 211 F.2d 357, 360; N. L. R. B. v. Cowell Portland Cement Co., 9 Cir., 148 F.2d 237, 246.

We agree with respondent that it would be grossly unfair and would not advance any purpose of the Act to require it to pay these inventory clerks for any wages lost, since the same was directly attributable to the fact that they deliberately and concertedly, prior to the time any job offers were made, decided that they would refuse to accept any other employment offered. The Board's order on this facet of the case is, in our judgment, a clear abuse of its discretionary authority.

The Board's order will be modified in accordance with the views herein expressed and, as modified, will be enforced.