NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

QUICK SHOP MARKETS, INC., an
Illinois Corporation,

and

Quick Shop Markets, Inc., a Missouri
Corporation, Respondent.

No. 17257.

United States Court of Appeals
Seventh Circuit.

Oct. 9, 1969.

**602**

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Leonard M. Wagman, Charles R. Both, Mitchell L. Strickler, Attys., N.L.R.B., Washington, D. C., for petitioner.

Thomas, Busse, Weiss, Cullen & Godfrey, St. Louis, Mo., Charles A. Kothe and Glenn R. Beustring of Kothe & Eagleton, Tulsa, Okl., for respondent.

Before KILEY, FAIRCHILD and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Petitioner, National Labor Relations Board (Board), seeks enforcement of its order finding respondents Quick Shop Markets, Inc. (an Illinois corporation) and Quick Shop Markets, Inc. (a Missouri corporation) guilty of violations of §§ 8 (a) (1), 8(a) (3) and 8(a) (5) of the National Labor Relations Act. The Board found that the respondent corporations violated § 8(a) (3) by terminating five employees because of their union activities, violated § 8(a) (1) by interrogating employees concerning their union activities, and violated § 8(a) (5) by refusing to bargain with the union. The Board ordered respondent to cease and desist from the § 8(a) (1) violations and affirmately ordered the respondent to reinstate four of the five employees who were fired [1] and bargain with the employees' union, Retail Clerks International Association, AFL–CIO Local 149 (Union).

The Illinois corporation consists of one small self-service convenience-type retail food store called a "Quick Shop," located in Wood River, Illinois, the place where the alleged unfair labor practices took place.[2] The Missouri corporation consists of forty such stores located throughout the State of Missouri. Mr. T. L. Tinsley is the president and director of both corporations and owns one-third of the stock of each.

The Wood River store opened for business in April of 1966. Three employees (Marilyn Melton, Janet Davis and her brother, Richard Tite) were hired during that month, while two others, Jon Greer and Thelma Clark, were employed June 1, and August 1, 1966, respectively. Thus the employee force of the Wood River store consisted of three women and two boys of high school age. Each of the women had a key to the store and knew the combination to the safe. One of the women would normally open the store at 7:00 a. m., work until 3:00 p. m., at which time one of the other women would work the remaining hours until 11:00 p. m. During the time she was on duty the

1. Employee Thelma Clark was denied reinstatement by the Board's order for misconduct on the picket line.

2. The annual sales of the Wood River facility alone does not measure up to the Board's minimum standard for asserting jurisdiction. The Board found, however, that the Illinois Quick Shop Markets, Inc., (i. e., Wood River store) and the Missouri Quick Shop Markets, Inc., which consisted of forty food stores, constituted a single employer for jurisdictional purposes. The trial examiner's finding (adopted by the Board), that the two corporations constituted a single employer was based on the corporations' common ownership and financial control, and the supervision of day-to-day personnel and labor policies of both corporations by the Missouri corporation. The trial examiner's determination was not challenged on appeal and we find the facts clearly support his conclusion that the respondent corporations constituted one employer for the purpose of the Board's jurisdictional requirement. Sakrete of Northern Cal., Inc. v. N. L. R. B., 332 F.2d 902, 905–907 (1964).

woman would wait on customers, arrange merchandise, dust the shelves, order groceries, and sign receipts for any merchandise which was delivered. The stock boys' duties (Richard Tite and Jon Greer) were to keep the shelves stocked with merchandise, clean the store and on occasion wait on customers and ring up sales on the cash register.

At the beginning of August, a few days after employee Thelma Clark had commenced work, she noticed small shortages in the cash register. The money in the drawer was less than it was supposed to be when compared with the amount of sales reflected on the tape of the cash register. She called these shortages to the attention of her supervisor, Mr. Ronald Coats, who supervises some eight stores of the Missouri corporation as well as the Wood River facility. Supervisor Coats did not appear concerned and told her the shortages were not sufficient to worry about.

On August 18, all five employees of the Wood River store signed union authorization cards and returned them to Robert Schreier, the Union's business representative. Union Representative Schreier mailed a registered letter to the president of respondent corporations, T. L. Tinsley, on August 22, advising him of the Union's majority status and requesting recognition as bargaining representative for the Wood River store employees. After mailing the letter, Schreier and Thomas McNutt, a national coordinator for the Union's parent international association, proceeded to Tinsley's office to show him a copy of the letter. They were informed that President Tinsley was out of town and that it was not known when he would return. Schreier left his name and telephone number and requested that President Tinsley contact him on his return, Schreier, however, did not leave a copy of the recognition letter. About one week later, the letter that Schreier had sent to President Tinsley on August 22 was returned to him unopened and marked "refused" by the Post Office. President Tinsley testified before the trial examiner that the letter was refused not because it was mailed by the Union, but because there had been a long-standing company rule that he personally is the only one with authority to receive registered mail unless it is specifically designated to another employee.

On the same day that Schreier visited President Tinsley's office, Chief Supervisor Daniel Ballard, President Tinsley's immediate subordinate, visited the Wood River store. Mr. Ballard observed employee Thelma Clark making some sales and afterwards making a mark on a piece of paper. Employee Clark informed Mr. Ballard that she was trying to keep track of what she had sold in view of the cash register shortages which had grown considerably since their first appearance at the beginning of August. Employee Clark also informed Mr. Ballard that she did not believe employee Tite was honest.

Ballard reported the shortages to President Tinsley the same day and told Tinsley that one of the employees (Tite) had been accused of wrong doing. Ballard was instructed to return to the store that night and interrogate Tite. Ballard returned to the store but Tite was not present because of illness. The following day, August 23, President Tinsley instructed Ballard to take an inventory of the store as soon as Supervisor Coats returned from his vacation. On Wednesday, August 24, Ballard and Coats conducted the inventory which showed a shortage of $252.16. Ballard testified that Tinsley upon hearing the results of the inventory, instructed him to let Coats run the store for a while "and to just let everyone go until he could get the things straightened out. * * *"

Coats, pursuant to Ballard's telephonic instructions, laid off all the employees on Thursday, August 25. On Friday morning, August 26, the employees established a picket line around the Wood River store, which continued until the time of the trial examiner's hearing. The legend on the picket sign stated:

QUICK SHOP Employes ON STRIKE For a Reasonable Contract—PLEASE DO NOT PATRONIZE THIS FIRM —Thank you—Local 149 Retail Clerks

Intl Assn AFL–CIO—Affiliated with Alton-Wood River Area Federation of Labor

The Board's findings of § 8(a) (1) and § 8(a) (3) violations stem directly from alleged anti-union statements made by Supervisor Coats on August 24 and September 16. Employee Janet Davis testified that on August 24 she had a conversation with Coats in which he asked her if the "union man" had been there, and if she had signed a card. She replied "Yes" to both questions. In addition, he inquired as to whether "all of us had signed one," to which she also replied in the affirmative. Employee Davis also testified to another conversation with Coats on August 25 at which time he told her he was going to run the store for a while. Coats testified that he had only one conversation with Davis on August 25 when he laid her off.

Employee Tite testified that on August 24 he also had a conversation with Coats in the backroom of the Quick Shop. During the course of the conversation Tite testified that Coats asked him who had joined the Union and how the Union "got in." Coats told Tite that if he wanted to keep his job he had better tell the Union that he did not want to become a member. Tite further testified that Coats said that President Tinsley had told Coats that there would never be a union here. Coats admitted that he had a conversation with Tite during the afternoon of August 24, the purpose of which, according to Coats was to find out what Tite knew about the shortages. Coats denied that the subject of the Union was mentioned during the conversation.

In determining the credibility of the witnesses Davis, Tite and Coats, the trial examiner stated:

I find the substance to be substantially as Davis and Tite testified. The latter, who was of more tender years, appeared more flighty and somewhat less sure of himself. However, neither impressed me as being possessed of a character or temperament that would enable them to fabricate.

On the other hand, Coats was not impressive as a witness. On the critical questions he was reluctant and evasive. * * *

Further, on or about September 16, 1966, while the employees were on the picket line, they were informed by Coats that they had been fired because of the Union and that the store was not union and was not going to become union. Testimony in support of this allegation was offered by employees Melton and Clark. Melton testified that while on the picket line Coats told her, "It's your fault you are out here. You should have known when you received those union cards you knew you would be fired." Employee Clark then inquired, "you mean you fired us for signing the union cards?" Coats replied yes, that they knew what the salary was when they went to work there and if they did not like it they should not have gone to work. Clark's testimony corroborated Melton's in all essential respects regarding this conversation. Coats did not recall any conversation with Melton on September 16. He did recall a conversation with Clark but accused Clark of trying to put words in his mouth to the effect of telling them that they were fired. However, Coats testified that he said nothing and drove away.

The trial examiner's determination as to the credibility of Melton, Clark and Coats was as follows:

Marilyn Melton impressed me as an honest and candid witness who answered questions directly and forthrightly. Clark was more abrupt, tended to be argumentative, and obviously became confused on the matter of dates. However, much of her testimony concerning the September 16 incident was mutually corroborative with that of Coats and Melton. As previously noted, Coats was not impressive as a witness, being quite evasive and reluctant on critical points.

## THE SECTION 8(a) (1) VIOLATIONS

 We find that the record as a whole substantially supports the Board's

finding of coercive interrogations and that the Board's order respecting the finding is proper. The credited testimony of employees Davis and Tite concerning statements made by Supervisor Coats on August 24 and the credited testimony of employees Melton and Clark concerning Coats' statements made to them in mid-September while they were on the picket lines were coercive interrogations violative of § 8(a) (1) of the Act. Although these employees' statements were contradicted by Supervisor Coats, it is well settled that "the issue of credibility is a matter for resolution by the Board." N.L.R.B. v. National Food Stores, Inc., 332 F.2d 249, 251 (7th Cir. 1964). Credibility findings relating to the August 24 and September 16 statements were clearly made by the hearing examiner in favor of the General Counsel's witnesses and these findings were adopted by the Board.

## THE SECTION 8(a) (3) VIOLATION

■ We also find that substantial evidence on the record as a whole supports the Board's finding that respondent employer was motivated by anti-union animus in laying off the five Wood River employees.

Respondent contends that it could not have been motivated by anti-union sentiment in laying off the employees because it was completely ignorant of any union activity at that time. We disagree. Although it is evident that respondent company's president, Mr. Tinsley, never read the contents of the letter requesting recognition by the Union, the interrogations of his agent Coats on August 24 indicated President Tinsley was aware of the union activity and was anxious to know the extent thereof. In addition to the credited testimony of Tite and Davis concerning Coats' questioning on August 24, three other facts support the Board's determination that President Tinsley was aware of union activities at the time the employees were terminated. (1) The Union's business agent Schreier left his name and telephone number with President Tinsley's receptionist when he tried to see Mr. Tinsley on August 22. (2) The return address on the refused certified letter which was postmarked August 22, 1966, stated as follows:

R.S.E.U. Local 344
402 State Street
Alton, Illinois 62002

Although President Tinsley was out of town at the time of Schreier's visit and the receipt of the registered letter, he was in close contact with his office and it can be reasonably inferred that he was informed of the visit and the letter. (3) In mid-September, Supervisor Coats revealed to employees Melton and Clark that the respondent employer had actually discharged the five Wood River employees on August 25 because they had signed union cards. These statements by Coats in September also indicate that his employer, Tinsley, was aware of the employee union activity at the time of their discharge on August 25, 1966.

We find there is substantial evidence in the record to support the Board's finding that the company was motivated by anti-union feeling and not by the cash register shortages. In addition to Supervisor Coats having told employees Melton and Clark that the five Wood River store employees were actually discharged on August 25 because they had signed union cards, the interrogation of employee Tite on August 24 indicated that he would lose his job if he remained in the Union. The finding that the respondent employer was motivated by anti-union sentiment is further strengthened by the fact that the respondent employer never held an investigation to determine the real cause of the cash shortages thereby discrediting its contention that it was motivated by valid business reasons. Consequently, we find that respondent employer's firing of the five Wood River employees constituted a § 8(a) (3) violation and the Board's order with respect to the finding is proper.

■ The respondent company next contends that even if it committed § 8 (a) (1) and § 8(a) (3) violations, the three female employees were in fact

supervisors and therefore do not come within the coverage of the National Labor Relations Act. We find the Board's determination that the three female employees are not supervisors within the meaning of § 2(1) of the Act has " 'warrant in the record' and a reasonable basis in the law," and is upheld. N.L.R.B. v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944).

## THE SECTION 8(a) (5) VIOLATION

 We disagree with the Board and find that the respondent company did not commit a § 8(a) (5) violation. Neither the unopened registered letter nor the legend on the employees' pickets were sufficient to constitute a clear and unequivocal demand of the employees to bargain, a prerequisite to a § 8(a) (5) violation. Wafford d/b/a Wafford Cabinet Co., 95 N.L.R.B. 1407 (1951); see also Sheboygan Sausage Co., 156 N.L.R.B. 1490 (1966).

Although the Board's findings supported by the record indicate that the company knew of the employees' union activities, at no time did the company indicate an awareness of a demand made by the Union to bargain. The unopened registered letter containing a demand to bargain, which was validly refused pursuant to a company policy, was not sufficient to convey a clear demand to bargain. See Filler Products, Inc. v. N.L.R.B., 376 F.2d 369, 380–381 (4th Cir. 1967); see also The Circle K Corporation, 173 N.L.R.B. #107 (1968) [adopting trial examiner's decision, 173 N.L.R.B. TXD, page 16]. In addition, we find the legend on the employees' picket signs which stated in part "On Strike for a Reasonable Contract" was not a sufficiently clear and unequivocal demand to bargain. At best such legend constituted an implied request to bargain which would not place the burden on the respondent company to seek out its picketing employees or request their participation in negotiations for collective bargaining. See N.L.R.B. v. Columbian Enameling and Stamping Co., 306 U.S. 292, 297, 59 S.Ct. 501, 83 L.Ed. 660 (1939).

Nevertheless, the hearing examiner found that even in the absence of a § 8(a) (5) violation, a bargaining order would be appropriate (which finding was adopted by the Board):

[T]he Board has with court approval, in similar situations ordered that an employer bargain with the Union where the employer's unfair labor practices resulted in the dissipation of the Union's majority and the destruction of the conditions for a fair election in which the Union could have demonstrated that majority. "To require the Union to submit to another election under the circumstances would be to permit Respondent to profit from its own unlawful conduct at the expense of the Union and the majority of the Respondent's employees." Northwest Engineering Company, 158 N.L.R.B. 624, enfd. 64 L.R.R.M. 2650 (C.A.D.C. March 24, 1967); * * *.

The §§ 8(a) (1) and 8(a) (3) violations of the respondent company could very well have a tendency to affect the unanimous pro-union sentiment expressed through authorization cards and render it impossible to hold a fair election to determine if union representation is now desired. As this court stated in Wausau Steel Corporation v. N.L.R.B., 377 F.2d 369 (7th Cir. 1967), in upholding the Board's bargaining order in the absence of a § 8(a) (5) violation:

We cannot say where the evidence does not disclose the inappropriateness of the Board's bargaining order that the Board has exceeded the statutory discretion given it. To devise appropriate remedies and to gauge when the labor atmosphere has been cleared so that a new election may be held are within the Board's discretion. Id. at 374.

Consequently, we find that a bargaining order is appropriate even in the absence of a § 8(a) (5) violation and enforcement of the order will be granted.

Enforcement granted.