NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

J. W. MORTELL COMPANY,
Respondent.

No. 18035.

United States Court of Appeals,
Seventh Circuit.

Feb. 10, 1971.

Pell, Circuit Judge, concurred and filed opinion.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Leonard M. Wagman, Morton Namrow, Attys., N.L.R.B., Washington, D. C., for petitioner.

John T. Weise, Charles J. Griffin, Jr., George J. Matkov, Jr., Chicago, Ill., for respondent; Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., of counsel.

Before SWYGERT, Chief Judge, KNOCH, Senior Circuit Judge, and PELL, Circuit Judge.

KNOCH, Senior Circuit Judge.

The National Labor Relations Board seeks enforcement of its Order issued November 28, 1967, against J. W. Mortell Company.[1]

The Board found violations of § 8(a) (1) of the National Labor Relations Act, as amended, Title 29 U.S.C. § 151 et seq., § 158, through coercive interrogation of employees regarding union activities, threatened denial of wage increases on the basis of union support, grant of benefits during a union organizing campaign, discriminatory enforcement of a no-solicitation rule, surveillance (actual and implied) and interference with Board processes by discouraging witnesses from conferring with the Board's attorney.

The Board also found violations of § 8(a) (3) and (1) of the Act by deprivation of a promotion for one employee, suspension of another, transfer and subsequent constructive discharge of a third, all because of union activity.

The United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO, began its campaign to organize Mortell employees by distribution of leaflets in front of the plant in November 1964. The first organizational meeting was held February 11, 1965, and the next day a foreman interrogated one of the employees respecting numbers of employees who had attended and their break-down by department and sex. A week later he warned the same employee that he could be fired for carrying union authorization cards and a supervisor accused him of passing these cards on company time, a charge the employee denied, warning him that he would be fired if he did not stop.

On February 22, 1965, when the Union wrote Mortell that it was conducting a union campaign, it asked for prompt steps to prevent further interference with the rights of the employees.

Mortell held a series of meetings early in March 1965 promising half-holidays before Christmas and New Year, longer vacations for employees with 15 years' service and paid wash-up time before lunch, which last Mortell witnesses said merely formalized what had become a practice. Mortell also issued a letter urging employees not to sign union cards, referring to improved working conditions and specifically citing (inter alia) some of the new benefits noted above, as well as promising monthly meetings for airing of grievances.

The Union furnished Mortell a list of employees who had agreed to serve on

---

an organizing committee. Among these were Marian Sheets and Robert Clipper.

An election was scheduled for August 3, 1965. Meantime there were a number of incidents of interrogation, and comment of a threatening nature by supervisory personnel. We need not recount these in detail. There were sharp conflicts in the testimony of the employees and Mortell's witnesses concerning the conduct of the various supervisory personnel. Mortell considers all these incidents of minor character not sufficient to afford a proper basis for inferring an anti-union animus.

■ The issue of credibility of the witnesses is a matter for the Board's resolution. N.L.R.B. v. National Food Stores, Inc., 7 Cir., 1964, 332 F.2d 249, 251; N.L.R.B. v. Quick Shop Markets, Inc., 7 Cir., 1969, 416 F.2d 601, 604–605.

■ It is well settled that coercive interrogation impairs an employee's freedom to select a collective bargaining representative. N.L.R.B. v. Henry Colder Co., 7 Cir., 1969, 416 F.2d 750, 753, and cases there cited.

■ Similarly promises of increased benefits undertaken for the purpose of impinging on the employees' freedom of choice violate the Act. Lincoln Manufacturing Co. v. N.L.R.B., 7 Cir., 1967, 382 F.2d 411, 414, cert. den. 389 U.S. 972, 88 S.Ct. 470, 19 L.Ed.2d 463.

■ Mortell contends that the promised benefits were motivated by its narrow victory in previous elections and based on a comparison study begun prior to November 1964. The plant manager testified he presented recommendations to Mortell's executive committee in November 1964 and that the committee approved them late in December 1964. If that was the case, the timing of their announcement and subsequent emphasis of the new benefits in the anti-union letter, were most unfortunate. The Board cannot be held to have reached an untenable conclusion in deciding that the new benefits were motivated by an intent to induce rejection of the Union.

■ The Board also found, and there is evidence to support the finding, that while distribution of literature and solicitation by anti-union employees (as distinguished from supervisory personnel) during working time was frequently condoned, Mortell's no-solicitation rule was enforced against employees who were union adherents. This constituted a violation of § 8(a) (1) of the Act. Revere Camera Co. v. N.L.R.B., 7 Cir., 1962, 304 F.2d 162, 165.

■ While it is possible to infer from the wording of the notices posted by Mortell an intent to discourage employees from appearing for interviews with a Board attorney, and the Board did construe the notices as conveying the impression that its own trial preparation was somehow subservient to the interest of the Union, we believe, in the light of all the circumstances as outlined in Judge Pell's concurring opinion, that this interpretation is an unduly strained one.

■ Mortell offered evidence that it demoted James Emling because of his unsatisfactory attitude toward supervisors. On one occasion he had allegedly called a supervisor a "damned fool." There was a conflict in the evidence on this incident presenting an issue of credibility for the Board. Here again the timing rendered the motive suspect. On April 15, 1965, after the Union filed its election petition, James Emling, who had been an early supporter of the Union, was assigned on a 90-day trial basis to new duties with a 15¢ hourly wage increase. He promptly ceased his union activities for a period of six weeks during which there was no criticism of his performance, but when he resumed union activity, he received warnings that such activity would get him into "hot water." His probation period was extended thirty days. Two weeks after the election he was told there would be no more overtime for him, and the new duties with their increased pay were taken away from him. No reason was given him at the time. At the hearing Mortell adduced evidence with reference

to several incidents during the first ninety-day probation period, but the Trial Examiner apparently did not credit the testimony that these incidents had been discussed with Mr. Emling during that period. The Board was warranted in concluding that Mortell was engaging in an act of reprisal. Trumbull Asphalt Co. of Delaware v. N.L.R.B., 7 Cir., 1963, 314 F.2d 382, cert. den. 374 U.S. 808, 83 S.Ct. 1697, 10 L.Ed.2d 1032.

■ Similarly it was not unreasonable for the Board to conclude that Mortell's suspension of Marian Sheets, a prominent and active proponent of the Union, was not truly based on an alleged report that she had threatened another employee but on a desire to punish her for union activity.

■ For the conclusion that Robert Clipper was constructively discharged, we find no such substantial support in the record. Although Robert Clipper was an active supporter of the Union, his activities in its behalf ceased with the holding of the election. He had been employed as part of the unloading crew in Department 17. Early in July 1965, after he suffered a back injury, he returned to work with Doctor's instructions not to perform heavy lifting. He continued in Department 17, but under Mortell's order to perform only light work while there.

On August 2, 1965, he was transferred to light work in Department 10. When that ran out, he went back to Department 17, still restricted to light work.

August 30, 1965, light work was found for him in Department 8, sweeping and washing trucks. This involved no heavy lifting. He quit his job about November 18, 1965.

The Board, on the ground that there was no continuing need to keep him on light work after August 13, 1965, the date of the final medical report, concluded that he was deliberately given less pleasant work, washing trucks outside, in the hope that he would quit. But Frank Donner, who was no longer employed by Mortell, but who had been personnel manager at the time, made a contemporaneous note in his own handwriting during a telephone conversation with the Doctor who cautioned him against recurrence of the back trouble if Mr. Clipper did not refrain from heavy lifting for "quite some time". He testified about this conversation.

The Board placed great reliance on the fact that one of the group leaders (who were specifically held not to be "supervisors") had assigned some heavy work to Mr. Clipper in August. However, there is no evidence that this improper assignment was known to management. Mr. Clipper never reported it. Nor is there any evidence that Mr. Clipper's distaste for washing trucks, communicated to another group leader, ever reached management.

The Trial Examiner took judicial notice of the fact that truck washing out of doors in cold weather was unpleasant work, but other employees had been doing it. Mr. Clipper suffered no rate reduction from these changes in assignment and the new work involved no heavy lifting.

Mortell was surely not obligated to risk further injury in reliance on Mr. Clipper's own feeling that he was able to do heavy lifting, as indicated by his requests for a job in Department 4, where the duties included stacking 40 to 80 pound buckets and tipping 500 to 800 pound drums.

Mr. Clipper was a full-time day college student. He had been working for Mortell only since December 1964. He could work only in the second shift where the 15 to 18 jobs available largely involved heavy lifting or required skills he did not possess.

Mr. Clipper testified that he quit because he was susceptible to colds and was missing too many school sessions because of illness. We do not understand the Trial Examiner's unwillingness to credit the assertion that Mr. Clipper knew that the truck washing work would be moved indoors shortly.

He was asked if he knew that and he replied that he had been told that the company was thinking of moving it inside, but that some part of the tank cleaning would have to continue outside as a safety measure.

The mere fact that the work was unpleasant and undesirable is not sufficient to render this transfer of duties a constructive discharge. See Montgomery Ward & Co., 1966, 160 NLRB 1729, 1742. There was no evidence that Mortell deliberately made the working conditions unbearable for Mr. Clipper. See Montgomery Ward & Co. v. N.L.R.B., 6 Cir., 1967, 377 F.2d 452, 459.

The Board's Order requires Mortell to cease and desist from the unfair labor practices found and from in any other manner interfering with the statutory rights of its employees. Affirmatively, Mortell is directed to offer reinstatement to Robert Clipper, to restore the extra job to James Emling, to expunge the suspension of Marian Sheets, and to reimburse them for loss of earnings suffered as a result of the discrimination, and to post appropriate notices.

With the exception of the provisions pertaining to Robert Clipper and alleged interference with the Board's processes, a judgment will be issued enforcing the Board's Order.

Partial enforcement granted.

PELL, Circuit Judge (concurring).

The Board by a two to one decision agreed with the Trial Examiner that Mortell, through the posting of certain notices, attempted to dissuade its employees from cooperating with the General Counsel and thereby interfered with the effectiveness of the Board's process in securing for employees vindication of rights protected by the Act, in violation of Section 8(a) (1). 29 U.S.C. § 158(a) (1).

On April 6, 1966, in preparation for the hearing in this matter, the General Counsel forwarded subpoenas and a covering letter to some 175 persons, approximately 100 of which were directed to Mortell's employees. The subpoena called for the attendance of the witness at the Board's hearing then scheduled for June 14. The letter that accompanied this subpoena stated that attendance at the time and place indicated in the subpoena was mandatory and that failure to so appear "subjects you to legal action being brought against you in the federal court"; the General Counsel is the only person who can grant a release from subpoena and that only after the General Counsel had talked to the individual could it be decided whether his attendance would ultimately be required. The letter concluded by requesting the addressee to telephone or call upon the General Counsel's representative at a specified motel between April 11 and April 15, 1966.

Shortly after the mailing, Mortell posted a notice on its bulletin board informing its employees that if they had any questions about the subpoena or letter, they should contact Personnel Director Donner. Donner testified that some six individuals responded to the notice and sought his advice, among whom was employee Karla Starr. The Board in its decision states that Donner admitted informing Starr that she did not have to respond to the request for an interview. I do not find support in the record for this statement. From the Trial Examiner's findings of fact it appears that Starr testified that Donner told her she did not have to appear in court or visit the General Counsel's representative at the motel and that she told Donner that she thought she had to go. While Mortell did not cross-examine Starr with respect to this aspect of her testimony, Donner did testify that he told Starr that she might have to appear at the trial but that compliance with the General Counsel's request that she confer with him at the motel "was strictly up to her." She could go or not, but that if she decided to go, and wanted time off for that purpose, he wanted advance notice.

The Trial Examiner in his findings of fact pointed out that Starr was born in

Germany and had not acquired much skill in the reading and writing of English and he was not convinced that there was any conflict between the testimony of Starr and Donner or that her testimony did not mean that Donner simply told her that a visit to the motel was not legally compulsory. I find no support for the Board reaching any other interpretation than that at which the Trial Examiner arrived.

On April 15, 1966 Mortell posted the following notice on its bulletin board:

### "NOTICE TO EMPLOYEES

"This notice is prompted for two reasons. First, many of our empoyees are confused as to the meaning and importance of communications which may have been received by them from the National Labor Relations Board, asking them to contact Mr. Eisenburg. Secondly, we wish to provide you with the truth about a meeting notice passed out by union organizers on April 13.

"1. On August 3, 1965, our employees rejected a union in a secret ballot election. The U.A.W. asked the N.L.R.B. to throw out the election results and give them the bargaining rights without a second election. The N.L.R.B. has agreed to hold such a hearing to consider this possibility. This is the reason many of our employees have received a notification about a subpoena to appear at the hearing.

"Preliminary to this hearing Mr. Eisenberg wishes to ask you certain questions about the union affair. Do not confuse the subpoena with Mr. Eisenberg's request. You are under no obligation to discuss the case with him prior to the hearing. If you wish to discuss the matter with him, you are encouraged to do so. However, we have received reports that union organizers, trying to supply witnesses for Mr. Eisenberg, have coerced and misrepresented Mr. Eisenberg's communication, causing some of our people to believe that they must contact Mr. Eisenberg at this time. This is typical of the union ethics we have all seen over the last sixteen months.

"Do not be intimidated by the union organizers. Their 'Notice of Meetings' handout is further intimidation to seek your cooperation with Mr. Eisenberg. They would have you believe a certified union exists and you had better play ball with them.

"2. The 'Notice of Meeting' handout is misleading. There is no certified Local 1387 at the J. W. Mortell Company. This is another instance of 'union baloney.' Whether our employees will eventually be represented by the U.A.W. will depend upon the outcome of the court hearing which will probably take several weeks. It will be months after the hearing before a decision is handed down.

"Wonder if those attending the meeting will be obliged to pay union dues?

### J. W. MORTELL COMPANY"

The Trial Examiner in his findings of fact states that the General Counsel apparently had some difficulty in contacting his witnesses, but the reason for this was not developed. In this respect it is to be noted that the "Notice to Employees" was not posted on the bulletin board until the last day on which the witnesses were requested to get in touch with the General Counsel's representative, so there is very little basis for thinking that the "Notice" was the cause for witnesses staying away.

In any event, on May 18, 1966 the General Counsel mailed one of two types of letters to. the witnesses; one type to the witnesses he regarded as "friendly" and the other to persons who had not responded to the letter of April 6.

The latter letter asked the addressee to communicate with the General Counsel at the motel during a designated period and also stated: "There is also another reason why it is advisable for you to contact me. If we meet, you may be excused or at least you will be given a definite time to appear, so as to reduce

to a minimum the inconvenience caused you. On the other hand, if you arrive at the hearing without having previously talked to me you may have to be present for many hours, or even more than one day, before you are called to testify."

After the aforementioned letters were received by employees, Mortell, on May 24, 1966, posted a further notice to employees on the bulletin board. This notice was as follows:

### "NOTICE TO EMPLOYEES MEETING WITH NATIONAL LABOR RELATIONS BOARD ATTORNEYS

"Once again employees have asked the Company if they must go to the motel of the government lawyers about the union case.

"*Feel free to go to the motel or feel free to stay away.* No one can legally pressure you either way. Some of you have been told you will be held in court by the government lawyers for four or five days. This is only a union pressure tactic to force you to go to the motel. We honestly do not believe the government lawyers will hold you in court just to punish you for not going to the motel. You might be required to wait in court several hours but we are confident that an orderly arrangement will be worked out.

"We sincerely regret these latest union pressure tactics, and we hope you will bear with us until this whole thing is concluded.

"*Feel free to go to the motel or feel free to stay away.*" (Emphasis in the original.)

Other than a minor discrepancy between the testimony of Starr and Donner, the evidence on this particular matter is undisputed. It has been held by this court that the Board's construction of written documents and undisputed evidence is not binding on this court. Celanese Corp. v. N.L.R.B., 291 F. 224, 226 (7th Cir. 1961). Irrespective of whether this particular holding is applicable in the case before us, it is clear that whether on the record as a whole there is substantial evidence to support the Board's findings is a question which Congress has placed in the keeping of the Courts of Appeals. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951). As did member Zagoria of the Board, I do not find that the notices in question were unlawful, being of the opinion that the Board's finding in this respect was not supported by substantial evidence.

The Board in finding that the activities of Mortell interfered with the rights of employees to obtain redress from the Board and thereby violated Section 8(a) (1) of the Act relied upon Certain-Teed Products Corp., 147 NLRB No. 160 (1964). Member Zagoria pointed out that unlike the situation in *Certain-Teed*, Mortell's notices were temperate in tone.

It appears to me that Mortell's written communications and actions were well within the ambit of freedom of expression permitted by 29 U.S.C. § 158(c), reading as follows:

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

I am unable to find in the record any showing that Mortell's activities in this particular regard interfered with employees' rights nor that the General Counsel was unable fully to present the employees' case at the hearing. The Personnel Manager correctly advised Starr that it was not legally compulsory for her to interview the General Counsel's representative at the motel. Not all of Starr's testimony was brought to

this court in the appendix and therefore it is not possible to tell whether she in fact did go to the motel. It is clear, however, that she did testify and all that she had to say about the situation was brought out at the hearing. Certainly there was nothing improper in the Personnel Director telling her that if she went to the motel he wanted to be advised thereof. The proper operation of a manufacturing plant requires, whenever possible, that there be advance notice of absenteeism so that there will be minimal interference with the normal operation of the plant.

It is also to be noted that it was the General Counsel who warned hesitant witnesses they might have to be present at the hearing "for many hours, or even more than one day" if they did not discuss the case with him in advance.

It appears quite evident from the notices posted that the union was also communicating with the employees on the subject of the meetings with the General Counsel's representative in a manner which the company felt misrepresented the situation. The company was answering the union's assertions and making it clear that there was no legal obligation to discuss the case at the motel. The company also stated, however, that if the employees wished to discuss the matter with him they were "encouraged to do so." The employer candidly indicated the objectivity of the government in the matter by stating that they felt confident that an orderly arrangement would be worked out for the employee to testify.

The union pressure tactics referred to in the last notice obviously was not with reference to the government communications but rather those from the union.

In the absence of any showing whatsoever that the General Counsel was in fact hampered in his presentation of this case, I find no basis in this particular matter for upholding the Board's decision.