**FLORIDA STEEL CORPORATION,**
**Petitioner Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent**
**Cross-Petitioner.**

No. 77–3307.

United States Court of Appeals,
Fifth Circuit.

Jan. 11, 1979.

Rehearing Denied Feb. 20, 1979.

Charles F. Henley, Jr., Jacksonville, Fla., for petitioner cross-respondent.

Robert G. Sewell, Atty., N.L.R.B., Eric G. Moskowitz, Atty., John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John S. Irving, N.L.R.B., Washington, D. C., for N. L. R. B.

Jeffrey L. Gibbs, Washington, D. C., for intervenor United Steelworkers of America, AFL–CIO.

Before GOLDBERG, Circuit Judge, SKELTON, Senior Judge *, and FAY, Circuit Judge.

SKELTON, Senior Judge.

This case is before the Court upon the petition of Florida Steel Corporation (the Company) to review and set aside an order of the National Labor Relations Board (the Board) issued against the Company on November 15, 1977, which is reported at 233 NLRB No. 74. The Board cross-petitions for enforcement of its order. The United Steelworkers of America, AFL–CIO (the Union), the charging party, has intervened.

The Board found that the Company violated § 8(a)(3) and (4) of the Act (29 U.S.C. § 158(a)(3) and (4)) when it discharged employee Donald Brans, rather than assign him to another position. The Board also found that the Company violated § 8(a)(1) of the Act by sending a letter to employees advising them of their right to ask for an opportunity to obtain legal counsel before talking to a Board agent and of the Company's willingness to assist employees on their request to obtain such counsel.

The Board agreed with the Company and the Administrative Law Judge (ALJ) that Brans was properly removed from his job as an overhead crane operator because of his negligence in performing the duties of that position. However, the Board held that the reason given by the Company for Brans' discharge (i. e. negligence) was pretextual and that his firing was anti-union motivated on the part of the Company.

The Board did not order Brans reinstated to the job of crane operator, but did order the Company to offer him "immediate and full reinstatement to a position suitable to his experience and abilities," and to "make him whole for any loss of pay he may have suffered ___ by payment to him of a sum of money equal to that which he normally would have earned as wages," with adjusted interest at not less than 7 per cent (the ALJ had allowed the customary 6 per cent), and issued a broad form company-wide order (the ALJ order was limited to the Tampa, Florida, plant, where the events in this case took place). We have carefully reviewed the entire record and, based on that review, hold that substantial evidence on the record as a whole does not support the order of the Board. Accordingly, we deny enforcement.

I. Background

Florida Steel Corporation is engaged in the manufacture and fabrication of steel and operates some twenty-two divisions located in eleven different cities throughout the southeastern United States. In 1973 the Union commenced organizing campaigns at the Company's steel mills in Charlotte, North Carolina, and Jacksonville, Indiantown, and Tampa, Florida.

The Union campaign at the Tampa plant began in 1973. It resulted in a Board-conducted election on February 26, 1976. Although the Union lost that election by an overwhelming vote, it was subsequently set aside by the Board on October 14, 1976, because of objections filed by the Union, and a second election was ordered to be conducted at such time as is deemed appropriate by the Board's regional office.[1] The second election has not yet been held.

---

* Senior Judge of the United States Court of Claims, sitting by designation.

1. The attempts to unionize various Florida Steel plants have extended for a period of several years. During this time the Union has filed numerous charges against the Company which have met with varying results. Many were dismissed or withdrawn without the necessity of a trial. The Administrative Law Judge dismissed some of the Complaints entirely. In others, the Courts denied enforcement. But in still others, the Courts have upheld findings that the Company has in fact engaged in unfair labor practices. It is clear that what is occurring is an extensive and hard-fought battle between a zealous union and a company which is equally zealous in its opposition to that union. In a companion case to the one before us, namely, No. 77–3432, *Florida Steel Corporation v. N.L.R.B.*, reported in 231 NLRB No. 115, of which we can take judicial notice, argued before us the same day as the instant case, we have listed in the opinion in that case the various cases that have been decided pro and con between the Union and the Company, together with a discussion of the struggle that has been going on between them for years.

Brans was very active for the Union during the election campaign. During the period preceding the election, Brans signed a union committee sheet, distributed leaflets at the plant gate and in the shop, wore union buttons and other insignia to work and attached a union bumper sticker to the vehicle he drove to and from work. In December, 1975, Brans testified against the Company at a Board hearing, resulting in a finding by the Board that the Company had coercively interrogated Brans with respect to his union activities.[2] Although the Company knew about Brans' union activities, there is no substantial evidence in the record that shows that such activities had anything to do with his discharge by the Company.

II.  The Discharge of Donald Brans

The Company discharged overhead crane operator Donald Brans on April 21, 1976, for careless and negligent operation of his crane. The record shows that Brans started working for the Company in 1968, and after holding several different jobs, was promoted in March, 1975, to overhead crane operator. He successfully operated the crane for approximately eight months and then, in October, 1975, he started causing a series of major accidents, the last of which resulted in his discharge.

His first and second accidents occurred in October, 1975, when, in a period of a half hour, he twice dropped the bail from the crane onto the shop floor. Brans admitted that he dropped the bail even though he had just been warned by a supervisor to be more careful. After the second accident, he was given a verbal reprimand by his supervisor.[3]

Brans' third accident occurred in January, 1976, when he hit the side of the furnace with the main hoist block, narrowly missing another employee. Brans admitted that this was a serious accident and that if the block, which weighed about 500 pounds, had hit the employee it would have killed him. Brans also admitted that it was his fault. As a result of this accident, Brans was given a written warning.

Brans' fourth accident occurred in March when he hit an employee in the back with a small hoist as he operated the overhead crane. This accident was thoroughly investigated and, in line with Company policy, Brans was given a two-day suspension.[4]

At the time of the suspension the Company had just developed a new crane training program. The program was designed for the purpose of teaching employees how to operate the crane in a safe manner. The program consisted of several lessons with cassette tapes so that the student could take the program without the necessity of an instructor. After each lesson the student was given a test to determine his comprehension. At this time the new program had been implemented at other plants but not in the Tampa mill. The Company made this new teaching aid available to Brans in order to make sure he had a proper understanding of how to operate the crane.

When Brans returned from his suspension, he was allowed to take the lessons during his normal work hours and was paid his regular rate of pay. He took one lesson each day and was given a test in which he scored 91% the first day, 93% the second day and 82% on the third. The minimal accepted grade for all three tests was 75%. After taking the course the maintenance supervisor rode in the crane with Brans to observe his work and to answer any questions.

From the time Brans completed the training course until his last accident his super-

---

For the sake of brevity, we refer to and adopt that part of that opinion for the listing and discussion of the cases and of the long-continued controversy between the parties. We see no need of repeating that listing and discussion here.

2.  *Florida Steel Corp.*, 224 NLRB No. 68 (1976).

3.  The Union filed a charge, 12–CA–6883, concerning this reprimand but it was dismissed by the Board's Regional Director.

4.  Again the Union filed a charge bases on this suspension, 12–CA–7145–2, but later withdrew it.

visor had an opportunity to observe his work habits and saw three minor incidents. On each occasion the supervisor cautioned Brans about the incident with Brans giving some type of excuse. Brans, when he testified, admitted the mistakes and also admitted that the supervisor had cautioned him about the incidents.

Finally, on April 19, Brans had his fifth and final accident. This time he was lifting a partially full ladle of hot molten steel to be dumped in the scrap yard. The ladle is a large container which at that time held some ten to fifteen tons of molten steel. The proper procedure was to raise the ladle with the overhead crane and then have the ladleman turn the ladle so that the auxiliary hoist could be connected. However, for some reason, Brans decided to turn it himself. To do so, he waved the ladleman away, raised the ladle and proceeded to bump the large ladle against a scrap bucket causing it to rotate. This rotating action caused the auxiliary hoist chain to be tangled with the gooseneck at the top of the ladle. Thus, when the ladle was lowered, the chain remained fixed, pulling the gooseneck and causing the stopper to open at the bottom of the ladle. At that time approximately a half a ton of hot, molten steel poured out on the shop floor. Two employees were in the area but were not hurt.

Brans admitted in his testimony that he was at fault in that he did not see the chain get tangled up in the gooseneck. Brans also testified that when the steel started pouring out of the ladle he did not have any idea where the ladleman was nor did he see another employee who was also in the immediate area. Brans also admitted that he did not have the authority to turn the ladle in such a manner and that he was wrong in doing so. As a result of this last accident Brans was terminated on April 21, 1976.

Based on this record of negligent job performance, the ALJ made the following findings:

"On March 16, 1975, Brans was promoted to the position of overhead crane operator. After an initial period of satisfactory performance, he encountered a series of accidents caused by his faulty operation of the crane. Thus, in October, 1975, January, 1976, March, 1976, and April, 1976, Brans' improper operation of equipment resulted in serious accidents, in one case causing physical injury to another employee and, in a second case, nearly killing a fellow employee. Also, in the October, 1975, to April, 1976, period, Brans' operation of his crane resulted in other, more minor, accidents.

"After each of the major accidents, Brans was disciplined. Thus, the October, 1975, accident was followed by an oral reprimand while the January, 1976, incident resulted in a written disciplinary warning. Following the accident in March of that year, Brans received a 2-day suspension and, upon his return to work, was required to complete a 3-day training program. As noted, after the April accident, he was discharged.

\*      \*      \*      \*      \*      \*

"Notwithstanding Respondent's [the Company's] knowledge of Brans' considerable activities in support of the Union \_\_\_ *I conclude, on the state of this record, that Respondent [the Company] was fully justified in its April 21, 1976, decision to remove Brans as a crane operator.* In view of the number of accidents, major and minor, which were caused by Brans' negligent operation of his crane, all occurring within a relatively short time span, *Respondent's [the Company's] need to take action was obvious.* This was particularly so in view of the safety hazard to other employees created by those accidents." (Emphasis supplied).

These findings and conclusions were adopted by the Board. Thus, it is clear that the Board found that the Company had just cause to remove Brans as a crane operator. This was a semantic finding that the Company had just cause to discharge Brans because of his negligence, although not expressed in those words. In any event, the meaning is clear, the facts are clear, and we hold that the Company proved that it had just cause to fire Brans.

■ When this proof was made by the Company, the burden shifted to the General Counsel to prove that anti-union animus was the motivating cause of his discharge. This rule is well established. In *Federal-Mogul Corp. v. N.L.R.B.*, 5 Cir. 1978, 566 F.2d 1245 [1978], 97 LRRM 2770, we held:

> "The burden of proof in a case such as this is upon the General Counsel and requires that he present substantial evidence that the discharge came from improper motives. *Frosty Morn Meats, Inc. v. N.L.R.B.*, 296 F.2d 617 (5 Cir. 1961). Furthermore, mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence. An unlawful purpose is not lightly to be inferred. *N.L.R.B. v. Federal Pacific Electric Company*, 441 F.2d 765 (5 Cir. 1971). *The employer does not have the burden of disproving the existence of unlawful motivation in discharging an employee.* See *N.L.R.B. v. Varo, Inc., supra,* and *N.L.R.B. v. Soft Water Laundry, Inc.,* 346 F.2d 930, 936 (5 Cir. 1965)." (Emphasis supplied).

We stated in *N.L.R.B. v. McGahey*, 233 F.2d 406 (5 Cir. 1956) that the burden of explanation for the discharge of an employee is not on the employer, but on the General Counsel, as follows:

> "*The employer does not enter the fray with the burden of explanation.* With discharge of employees a normal, lawful legitimate exercise of the prerogative of free management in a free society, the fact of discharge creates no presumption, nor does it furnish the inference that an illegal—not a proper—motive was its cause. An unlawful purpose is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one. (Cases omitted)." (233 F.2d 413). (Emphasis supplied).

In *Clothing Workers, Midwest Regional Joint Board v. N. L. R. B.,* 183 U.S.App.D.C. 413, 564 F.2d 434 (1977), the court held:

> "When good cause for discharge or suspension is clearly established, the burden

is on the Board to show that anti-union animus was the motivating factor. (Citations omitted). The burden on the Board is not simply to discover some evidence of improper motive, but to find an affirmative and persuasive reason why the employer rejected a good cause and chose an illegal one. (Citation omitted). The mere existence of anti-union animus is not enough." (at 419, 564 F.2d 440).

■ Where good cause for the discharge of an employee is shown, as in the instant case, the fact that anti-union animus existed on the part of the employer does not make the discharge unlawful unless the General Counsel proves a causal connection between the anti-union attitude of the employer and the discharge. In this connection, we held in *N. L. R. B. v. O.A. Fuller Super Markets, Inc.,* 374 F.2d 197, 200 (5 Cir. 1967):

> "Only if the Board adequately sustains its burden of producing evidence on the record as a whole which establishes a reasonable inference of causal connection between the employer's antiunion motivation and the employee's discharge can its order properly be enforced. See *NLRB v. Soft Water Laundry, Inc., supra,* 346 F.2d at 936; *Schwob Mfg. Co. v. NLRB,* 5th Cir. 1962, 297 F.2d 864, 868."

Again, in *N. L. R. B. v. Mueller Brass Co.,* 509 F.2d 704 (5 Cir. 1975), we stated:

> "The Board must sustain its burden of showing evidence on the record as a whole which establishes a reasonable inference of causal connection between the employer's antiunion motivation and the employee's discharge." (509 F.2d 711).

In the instant case the Board did not prove by substantial evidence on the record as a whole that there was a causal connection between the anti-union attitude of the Company and the discharge of Brans.

■ The fact that Brans was inefficient and negligent, which gave the Company just cause to fire him, but also participated in union activities, was not sufficient, without more, to make his discharge unlawful. See *N. L. R. B. v. Fuller Super Markets,*

*Inc.,* 374 F.2d 197 (5 Cir. 1967), where we held:

"If the specific employee happens to be both inefficient and engaged in union activities, that coincidence standing alone is insufficient to destroy the just cause for his discharge. *NLRB v. Soft Water Laundry, Inc.,* 5th Cir. 1965, 346 F.2d 930, 934." (374 F.2d 200).

Since the Company had just cause to discharge Brans, his discharge cannot be vitiated just because he was pro-Union and the Company was anti-Union. That was our holding in the similar case of *N. L. R. B. v. Birmingham Publishing Co.,* 262 F.2d 2, 9 (5 Cir. 1958) where we said:

"If a man has given his employer just cause for his discharge, the Board cannot save him from the consequences by showing that he was pro-union and his employer anti-union."

We said in *N. L. R. B. v. Winn-Dixie Stores, Inc.,* 410 F.2d 1119 (5 Cir. 1969):

"But this knowledge of union activity and participation coupled with anti-union animus would not, standing alone, warrant the Board's decision. There must be something more to warrant the pretextual charge." (410 F.2d 1120).

\* \* \* \* \* \*

"The Act does not insulate an employee from discharge. It is only when anti-unionism is the motive for the discharge that the Act is violated. The burden of proof is carried only when substantial evidence pointing toward the unlawful motive appears from the record taken as a whole. *NLRB v. I. V. Sutphin, Co.-Atlanta, Inc.,* 5 Cir. 1967, 373 F.2d 891. That substantial evidence is lacking here.

"Enforcement DENIED." (410 F.2d 1121).

See also *Schwob Mfg. Co. v. N. L. R. B.,* 297 F.2d 864, 871 (5 Cir. 1962), where we held that "Union membership is no guaranty against discharge."

The principle involved here is much like that in *N. L. R. B. v. Speed Queen,* 469 F.2d 189 (5 Cir. 1972), where the court held:

"*But knowledge of union activity and an anti-union attitude, does not necessarily lead to the conclusion that a discharge is pretextual.*

'[W]here a proper motive for the discharge can as reasonably be inferred as an improper motive, the discharge should not be set aside by the Board where the more substantial evidence supports the proper motive.' *DC International, Inc. v. N. L. R. B.,* 385 F.2d 215, 220 (8th Cir. 1967); *N. L. R. B. v. Ace Comb Co.,* 342 F.2d 841, 847 (8th Cir. 1965).

"We find there to be no substantial evidence to support the Board's finding that the discharge was pretextual. To the contrary, the overwhelming direct evidence supports the proper motive alleged by Springstroh." (469 F.2d 194). (Emphasis supplied).

In the instant case, the decision of the Board, that the reasons given by the Company for firing Brans were pretextual and that his discharge was anti-union motivated, was based solely on the history of the Company in opposing various charges filed by the Union. The record shows that the Union has waged an aggressive campaign for many years in filing as many charges as possible against the Company. Obviously, this has been a part of its strategy to build up a long history of anti-union activity on the part of the Company to discredit it before the Board. The strategy worked well in this case, as the Board repeatedly referred to the history of charges filed by the Union against the Company. However, the record shows, and the General Counsel admitted at oral argument, that dozens of charges had been filed by the Union and many of them, but not all, had been dismissed.[5] As shown above, even in this case the Union filed two other charges in connection with the reprimand and suspension given to Brans by the Company due to his negligence that ultimately led to his discharge, but dropped them as they were obviously without merit. It is clear that

---

**5.** See footnote No. 1, *supra.*

the Union has had a propensity for filing charges against the Company, as the old saying goes, "at the drop of a hat." [6] It has aggressively prosecuted some of these charges, including those in the present case. The Union intervened in the instant case and its attorney appeared at the trial and questioned and cross-examined witnesses, although this function was also performed by the General Counsel. On appeal to this court, the Union filed a brief in addition to that filed by the General Counsel. The attorney for the Union appeared at the hearing and made an oral argument in addition to the argument made by the General Counsel. Of course, the Union had the right to participate actively in the case. Its energetic participation is only mentioned here to show, along with the many charges filed, the vigorous and determined campaign it has waged against the company. The Union obviously prevailed on the Board in the instant case to include various punitive provisions in its Order, which had no purpose under the evidence except to punish the Company for its long history of opposing the Union (see footnote 10, *infra*).

■ An unlawful motivation in the discharge of an employee cannot be based solely on the general bias or anti-union attitude of the employer, whether proved or conceded, but must be established by other facts in each individual case. That was our holding in *N. L. R. B. v. Dan River Mills, Inc.*, 274 F.2d 381, 384 (5 Cir. 1960) where we said:

> "A discharge becomes forbidden only if motivated by an unlawful purpose to discriminate against the Union or its adherents. *A general bias or a general hostility and interference, whether proved or conceded, does not supply the element of purpose. It must be established with respect to each discharge."* (Emphasis supplied).

This is especially true where, as in the instant case, the employer had good cause for the discharge.

■ The general bias of the Company against the Union is insufficient to support the Board's opinion. Remedies granted in other cases, where the facts and records are not before us, do not compel us to approve the same remedies, or any remedy at all, in this case. We propose to decide this case on the basis of the facts proven by substantial evidence on the record as a whole in this particular case, and not on the general anti-union bias of the Company, nor on what happened in other cases.

■ We conclude that the Board based its decision, that the Company violated § 8(a)(3) of the Act in discharging Brans, solely on the anti-union history and general bias of the Company as revealed by other charges and cases that had no causal connection with Brans' discharge. It is established by the above authorities that such anti-union attitude of the Company, standing alone, is not substantial evidence that will support the Board's decision.

Under these circumstances, we hold that the decision of the Board that the discharge of Brans by the Company was anti-union motivated, is based on pure suspicion, conjecture, and theoretical speculation.

It is well established that suspicion is not substantial evidence and will not alone support an order of the Board. In *Federal-Mogul Corp. v. N. L. R. B., supra*, we said:

> "Mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence. An unlawful purpose is not to be lightly inferred."

We held in *N. L. R. B. v. Federal Pacific Electric Co.*, 441 F.2d 765 (5 Cir. 1971):

> "Ascribing proper weight to the credibility determinations of the Examiner, *Universal Camera Corp. v. N. L. R. B.* [340 U.S. 474, 71 S.Ct. 545, 95 L.Ed. 456], *supra*, the conclusion seems inescapable that no substantial evidence exists to sup-

---

**6.** In the companion case, No. 77–3432, *Florida Steel Corp. v. N. L. R. B.*, described above in footnote No. 1, employee Bassett was discharged for falsifying his job application. When questioned about it by the Company the Union promptly filed a § 8(a)(3) unfair labor charge against the Company claiming it had harassed the employee. That charge was dropped by the Union, as there was no basis for it.

port any inference of unlawful employer motivation. Substantial evidence is 'more than a mere scintilla. It means such evidence as a reasonable mind might accept as adequate to support a conclusion.' *Consolidated Edison Co. v. N. L. R. B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). *Mere suspicions of unlawful motivations are not sufficient to constitute substantial evidence. Lozano Enterprise v. N. L. R. B.*, 357 F.2d 500 (9th Cir. 1966). It is incumbent upon the General Counsel of the Board to prove unlawful conduct and an unlawful purpose is not lightly to be inferred. 'In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of *believable* evidence pointing toward the unlawful one.' *N. L. R. B. v. McGahey*, 233 F.2d 406, 413 (5th Cir. 1956). [Emphasis in the text]. Seemingly arbitrary discharges, even if harsh and unreasonable, are not unlawful unless motivated by a desire to discourage protected union activity." (441 F.2d 770). (Emphasis supplied).

Again, in *N. L. R. B. v. Fuller Super Markets, supra*, our opinion contained the following statement:

"To justify enforcement of an order of the Board the evidence must do more than merely create a suspicion of the existence of facts upon which the order is based . . . ."

■ The Company stated and proved that it discharged Brans because of his repeated acts of carelessness and negligence in operating the overhead crane. The ALJ and the Board agreed that the Company was justified in its decision to remove Brans from his job and "in view of the number of accidents, the Company's need to take action was obvious." However, they held that the failure of the Company to give him a different job after he was discharged as a crane operator was unreasonable in view of the fact that he had worked in other positions in the Company's plant before being promoted to the position of crane operator. In so holding, the Board invaded the right of the Company to make a managerial deci-

sion as to whom it would employ for the various jobs in its plant. We have held many times that management is for management and not for the Board. The law is clearly set forth in our decision in *N. L. R. B. v. McGahey, supra*, where we held:

"*The Board's error is the frequent one in which the existence of the reasons stated by the employer as the basis for the discharge is evaluated in terms of its reasonableness.* If the discharge was excessively harsh, if lesser forms of discipline would have been adequate, if the discharged employee was more, or just as, capable as the one left to do the job, or the like, then, the argument runs, the employer must not actually have been motivated by managerial considerations, and (here a full 180 degree swing is made) the stated reason thus dissipated as pretense, naught remains but anti-union purpose as the explanation. *But as we have so often said: management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision. Management can discharge for good cause, or bad cause, or no cause at all.* It has, as the master of its own business affairs, complete freedom with but one specific definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a)(3) forbids. *N. L. R. B. v. Nabors* [5 Cir., 196 F.2d 272], supra; *N. L. R. B. v. National Paper Co.* [5 Cir., 216 F.2d 859], supra; *N. L. R. B. v. Blue Bell, Inc.* [5 Cir., 219 F.2d 796], supra; *N. L. R. B. v. C. & J. Camp, Inc.* [5 Cir., 216 F.2d 113], supra." (233 F.2d at 412–13). (Emphasis supplied).

This holding was quoted with approval by us in *Schwob Mfg. Co. v. N. L. R. B.*, 297 F.2d 864, 870 (5 Cir. 1962).

It follows that the decision of the Company not to re-hire Brans in another capacity was one for the Company to make, and the Board had no authority to second-guess it or substitute its judgment for that of the Company, or even to supervise what the Company did in that respect.

Furthermore, we point out that the so-called "reinstatement" order of the Board cannot be enforced, because, among other reasons, it contains contradictory provisions. Since Brans was not ordered reinstated to the job of crane operator from which he was fired, which was the only job he had, the questions that immediately arise are: To what position was he ordered reinstated by the Board? Did the Board propose to decide what job he was to have, and, if so, by what authority? Was the unknown job available? Where is the loss of wages and other benefits on a theoretical job Brans did not hold when he was fired, and how do you calculate it? Obviously, no back pay was due Brans on the crane operator job from which he was fired as he was not ordered reinstated to that job. Neither was any back pay due him on any other job he did not hold when he was discharged. When viewed in the light of these questions and observations, the Board's so-called "reinstatement" order of Brans becomes patently absurd.

Actually, the Board's order was a flat directive to the Company to give discharged employee Brans a job. The Board had no such authority. The Company, as an employer, had complete discretion as to whether it would hire Brans or any other person as an employee, and could determine where, when and how he would work, his salary, and what his duties were. These were managerial decisions that only the Company could make. After the Company discharged Brans, it decided for reasons of its own that it would not hire him for another job. It had a perfect right to make that managerial decision. As stated above, the Board had no authority to substitute its decision on this managerial matter for that of the Company, and to the extent that it tried to do so amounted to an attempt by the Board to take over the management of the Company. Congress never gave the Board any such authority when it enacted the National Labor Relations Act (the Act).

Furthermore, that part of the Board's order that required the Company to pay Brans back pay plus interest and other benefits when he was not ordered reinstated to the job from which he was fired, clearly imposed a penalty on the Company that was equivalent to the imposition of a fine in a criminal case. Again, the Board overstepped its authority. We have held many times that the orders of the Board are required to be remedial and not punitive. See *Frosty Morn Meats, Inc. v. N. L. R. B.*, 296 F.2d 617, 621 (5 Cir. 1961).

In any event, the decision of the Company not to re-hire Brans was reasonable under the circumstances, although under the authorities cited the reasonableness of its decision is not an issue here. The Company was justified in fearing that if it put Brans in another position, with his known history of dangerous negligence, and someone should be injured or killed due to his carelessness, the Company could have been exposed to tremendous liability in a suit for damages. The Company was not required to take such a risk, and the Board had no authority to subject it to such potential liability.

The ALJ and the Board held that Brans was discriminated against because he was not given the same treatment that another employee, Walter Hill, received after he was discharged as a crane operator. Hill was re-hired by the Company as a utility man after his discharge. The Board rationalized that Brans should also have been re-hired in some other capacity, and since that was not done there was discrimination and a violation of § 8(a)(3) of the Act. We do not agree.

In the first place, whether or not Brans would be placed in another position with the Company after his discharge as a crane operator was strictly a managerial decision for the Company to make. For that reason, there is no need to consider it further. However, we propose to show *arguendo* that in any event there was no discrimination practiced against Brans by the Company.

In order to be guilty of violating § 8(a)(3) there must be discriminatory treatment of an employee. We held in *N. L. R. B. v. Mueller Brass Co., supra* :

"The sum and substance of an unfair labor practice under Section 8(a)(3) is employer discrimination. The Act prohibits an employer, 'by discrimination in regard to hire or tenure of employment . . to encourage or discourage membership in any labor organization.' Under the Act, discrimination consists in treating like cases differently. *NLRB v. Whitfield Pickle Co.*, 374 F.2d 576 (5th Cir. 1967)." (509 F.2d 712).

We held similarly in *Mueller Brass Co. v. N. L. R. B.*,, 544 F.2d 815 (5 Cir. 1977):

"The essence of discrimination in violation of Section 8(a)(3) of the Act is in treating like cases differently." (544 F.2d 819).

It is clear that the cases of Brans and Hill were not "like cases" within the meaning of § 8(a)(3). In order to distinguish between the circumstances involving employees Hill and Brans, it becomes necessary to consider and analyze, in some detail, the Company's actions toward Hill. Walter Hill was promoted from his position as operator of an overhead crane to operator of a diesel electric (DE) crane in June or July of 1975. The record reveals that Hill was the senior mag crane operator who sought the position.[7] From the very beginning of his tenure in operating the DE crane, Hill experienced difficulties. He had what he himself described as "quite a few accidents." His supervisor testified that Hill had derailed the DE crane "more times than I think anybody I've seen out there," and he caused more pigtails (an electrical device) to have to be replaced "than any other crane operator out there." The supervisor further testified that he worked with Mr. Hill frequently, since the promotion was based on seniority, and he wanted to give Hill a fair chance. In compiling a "Performance Review" form on Hill for the period of November 23, 1975, to December 23, 1975, the supervisor rated Mr. Hill consistently low, and under the caption "IMPROVEMENT: What improvement(s) in his/her performance would best benefit both employee and the Company," he wrote the following:

"This employee did not have the ability to do the job assigned. He has been doing the job since August with no improvement."

Hill signed the form on January 2, 1976, the form showing the words "No Comment" under the space labeled "Employee Comments." Hill himself testified that on a prior occasion, when his supervisor was warning him that he would be removed from the DE crane if he did not avoid so many accidents, the supervisor told him that "[he] wasn't intelligent enough to run the crane; [he] couldn't handle the crane. The crane was running [him] . . ."

Hill was subsequently removed from the position of DE crane operator in late December of 1975 or early January of 1976, and given the position of utility man. As a utility man he would fill-in wherever needed in the plant and would be paid on the basis of where he worked on a particular day. This job, although a step down from his job on the DE crane, was still a promotion from the position of overhead crane operator.

The distinction the Company makes between employees Hill and Brans is that Hill was a victim of over-promotion. He was simply promoted to a position which was beyond his capability to perform; while Brans, on the other hand, was able to perform his job, but failed to do so as the result of inexcusable negligence. Our review of the record indicates that the record supports this contrast between the cases of the two employees. Both employees had good records prior to assuming their new jobs, but the crucial difference was that while Hill never seemed to grasp his job, as evidenced by the frequent accidents throughout the six to seven months he operated the DE crane, Brans showed the ability to do the work required by his job in performing it satisfactorily for some eight months prior to the commencement of his rash of accidents. And lastly, another dif-

7. The operation of the DE crane was more difficult than the operation of the other cranes and, therefore, operators of a DE crane received more pay.

ference, and one made even more alarming when considered in light of Brans' ability to perform properly, is the fact that his carelessness caused physical injury to one fellow employee and placed others in serious danger of injury or death. Hill's accidents, on the other hand, were primarily mechanical in nature. They created no serious risk of injury; they merely slowed production.

The cases are distinguishable and are not "like cases" that would allow the action taken with regard to employee Hill to be of significant value in establishing that Donald Brans was subjected to discrimination as provided in § 8(a)(3) of the Act.

Brans' case is more like that of another DE crane operator named James Sullivan who was discharged by the Company because of a serious accident he had while operating a crane. His discharge was challenged by the Union, just as it has challenged Brans' in this case, but the ALJ and the Board dismissed the Union's charge. See 215 NLRB (1974). Brans' situation was more akin to that of Sullivan's than Hill's, yet the Board ignored Sullivan's discharge in reaching its decision in the instant case. If the Board wished to be consistent, it should have upheld Brans' discharge as it did that of Sullivan, since their cases were "like cases" within the meaning of the Act and both received the same treatment.

The Board held that the Company fired Brans because he was a Union activist, and, therefore, he was discriminated against. We do not agree. The negligence of Brans was so flagrant and dangerous that the Company had every reason to fire him regardless of his union activity, and it is obvious that he would have been discharged in any event because of his careless work. Discrimination played no part in what the Company did.

In *Frosty Morn Meats, Inc. v. N. L. R. B.,* 296 F.2d 617, 621 (5 Cir. 1961), this court stated:

> "If, however, the misdeeds of the employee are so flagrant that he would almost certainly be fired anyway there is no room for discrimination to play a part. The employee will not have been harmed

by the employer's union animus, and neither he nor any others will be discouraged from membership in a union, since all will understand that the employee would have been fired anyway. *It must be remembered that the statute prohibits discrimination,* and that the focus on dominant motivation is only a test to reveal whether discrimination has occurred. *Discrimination consists in treating like cases differently.* If an employer fires a union sympathizer or organizer a finding of discrimination rests on the assumption that in the absence of the union activities he would have treated the employee differently.

> "*When an employee gives his employer as much reason to fire him as Judkins did,* by refusing to follow instructions and by giving not only his supervisors but also his fellow employees the impression that he was uncooperative, *there is no basis for the conclusion that the employer has treated him differently than he would have treated a non-union employee. As a speculative matter, it may or may not be true that union animus loomed larger in the employer's motivation than Judkins' shortcomings as a worker. But when the evidence of just cause for discharge is as great as it is here, the record as a whole does not support the conclusion that the discharged employee was deprived of any right because of union activities.* The power of reinstatement is remedial. It is not punitive. It is not to penalize an employer for anti-unionism by forcing on the pay-roll an employee unfit to stay on the job . . ." (Emphasis supplied).

The reasoning of the court in that case is equally applicable here to Brans' discharge.

As further proof that Brans' union activity had nothing to do with his discharge, it should be noted that if the Company had been looking for an excuse or pretext to fire him, it had good cause to do so long before it took that action. For instance, the Company could have terminated him when he had his first two accidents, but instead gave him a reprimand. He could have been separated when he had his third

accident, but instead he was given a written warning. Just cause existed for his discharge when he had his fourth accident, but instead the Company suspended him for two days. On his return from the suspension, the Company went to the trouble of making special arrangements for him to take a training and safety course in crane operation that had been implemented by the Company at its other plants but not at the Tampa plant.[8] When he finished the course, the maintenance supervisor rode in the crane with him and cautioned him about three minor incidents. Then came the fifth and final accident in which Brans negligently dropped a half ton of molten steel on the floor of the plant near other workmen. The Company could stand no more of such negligence and promptly fired him. The foregoing patience and forebearance of the Company shows that it made every effort to keep Brans employed as a crane operator and "leaned over backwards" to help him keep his job in that capacity. The Company should be commended for trying so long and so hard to keep Brans operating the crane properly, instead of being accused of having an unlawful motive when it was forced for its own protection and that of its other employees to fire Brans because of his repeated acts of negligence. It is clear that his union activities, which the Company had known about for over three years, had nothing to do with his discharge. It is obvious, as pointed out above, that the term "reinstatement" in the Board's order is a misnomer, because Brans is not being ordered reinstated to the job from which he was fired. However, if the order of the Board in this regard can be said *arguendo* to be one of reinstatement, it cannot be upheld under the facts of this case. We feel as the court did in *Mueller Brass Co. v. N. L. R. B., supra,* where we stated:

8. In keeping with its usual practice of filing charges and complaints on practically everything the Company did that had any effect, real or imaginary, on its employees, the Union filed a charge that when the Company insisted that Brans complete the crane training and safety program, it was a violation of § 8(a)(1) of the Act. The ALJ held against the Union on this complaint, saying:

"We are literally shocked by the conclusion of the Board that Rogers was discharged in violation of the Act and that he is entitled to be reinstated." (544 F.2d 815 at 819).

See also *Federal-Mogul Corp. v. N. L. R. B., supra,* where we reached the same conclusion. We hold that the reinstatement of Brans would be punitive in nature and a miscarriage of justice. This is not permissible. We held in *Frosty Morn Meats, Inc. v. N. L. R. B., supra:*

"The power of reinstatement is remedial. It is not punitive. It is not to penalize an employer for anti-unionism by forcing on the pay-roll an employee unfit to stay on the job." (296 F.2d 617 at 621).

As to reinstatement of a discharged employee, the Act provides:

"No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." (29 U.S. C.A., § 160(c)).

In the instant case, Brans was clearly discharged for cause. Accordingly, the Board exceeded its authority and acted contrary to the above mandatory provision of the Statute when it ordered him reinstated with back pay.

Our decision in *Frosty Morn Meats, Inc. v. N. L. R. B., supra,* where we held as follows is particularly applicable:

". . . when the evidence of just cause for discharge is as great as it is here, the record as a whole does not support the conclusion that the discharged employee was deprived of any right be-

"I find that Respondent was warranted in requiring that Brans complete a training program following the March, 1976, accident, Brans' third major accident within a 5-month period. Respondent's actions in that regard were not in violation of Section 8(a)(1) of the Act, as alleged in the Complaint."

cause of union activities." (296 F.2d 617 at 621).

The same reasoning is pertinent here.

It should be pointed out that if the Board's order regarding the discharge of Brans should be approved, it would mean that the Company henceforth would never be able to discharge any union activist regardless of how negligent, inefficient, or careless he might be, because the Union or the Board, or both, would simply require the Company to place him in a different job. Congress never intended that a Union or the Board would have such power or control over the managerial affairs of any company.

We hold that substantial evidence on the record as a whole does not support the order of the Board that the Company violated § 8(a)(3) of the Act when it discharged Brans and that part of the order is denied enforcement.

■ The Union has also charged, and the Board has held, that the Company discharged Brans because he testified against the Company at a Board hearing in another case (See *Florida Steel Corporation*, 224 NLRB No. 587 (1976)), and thereby violated § 8(a)(4) of the Act. We do not agree. The General Counsel did not prove that there was any causal connection between Brans' testifying in that proceeding and his discharge by the Company in the instant case. Substantial evidence on the record as a whole does not support this charge and it cannot be sustained. The order of the Board in this regard is denied enforcement.

III. The Company Letter To The Employees

■ The Union filed yet another charge in this case complaining that the Company violated § 8(a)(1) of the Act when it distributed a letter to its employees on April 20, 1976, the pertinent part of which was as follows:

". . . In addition, if a National Labor Relations Board agent should drop in on you, you may ask for an opportunity to obtain legal counsel before you talk to him.

"If you should want some legal counsel, or just help in handling any of the situations described above, all you need to do is let your supervisor know. He will put you in touch with someone who can help you."

No union election campaign was in progress at the time the letter was distributed, as the election had already been held and won by the Company and the Board had not yet ordered another election to be held. This is the fifth charge filed by the Union against the Company in this case.[9]

The ALJ held that the distribution of the letter was a violation of § 8(a)(1) of the Act by the Company, saying:

"I further conclude that Respondent violated § 8(a)(1) of the Act by its April 20, 1976, letter to employees advising them of their right to obtain legal counsel before talking to a Board agent, and of Respondent's willingness to assist employees in obtaining such counsel. In light of all the circumstances, including Respondent's pattern of unlawful conduct, as shown in this and previous cases, the letter seems a patent attempt to obstruct the investigations of the Board by discouraging employees from supplying information to Board agents."

He then ordered the Company to:

"1. Cease and desist from:

(c) Informing employees that they can obtain legal counsel before talking to a Board agent, or that Respondent [the Company] will assist them in obtaining such counsel."

The Board not only approved the findings and conclusions of the ALJ, but also went a

---

9. As indicated, the five charges filed by the Union were with reference to:
1. Brans' reprimand.
2. Brans' two-day suspension.
3. The crane operation and safety course.
4. Brans' discharge.

5. The Company letter to its employees. The Regional Director dismissed the first charge. The Union dropped the second as being without merit. The ALJ ruled against the Union on the third, and the last two are before us for decision.

step further when it held that the letter was distributed by the Company "for the purpose of obstructing Board investigations." In this connection, the Board held:

"He also shall clarify par. 1(c) of the recommended order [of the ALJ] to provide that Respondent cease and desist from informing employees that they can obtain legal counsel before talking to a Board agent, or that Respondent will assist them in obtaining such counsel, for the purpose of obstructing Board investigations."

The Board then entered the following order requiring the Company to:

"1.   Cease and desist from:

(c) Informing employees employed throughout its corporate facilities that they can obtain legal counsel before talking to a Board agent, or that Respondent will assist them in obtaining such counsel, for the purpose of obstructing Board investigations."

Obviously, the ALJ and the Board interpreted the letter as being coercive and compulsory and a restraint on the employees of their rights, as guaranteed by § 7 of the Act. As a matter of fact, the Board states in its brief that the letter suggests that "employees approached by a Board agent *should* so inform their supervisor and obtain his assistance." [emphasis in text]. On its face, the letter neither says nor suggests any such thing. It *offers* employees the assistance of the Company in securing legal counsel, *if the employee should want and ask for such help*. The letter offers such assistance to all employees, regardless of the position they take with respect to the Union and regardless of the position they take with respect to talking to the Board's agent.

We do not agree with the interpretation of the letter by the ALJ and the Board. We interpret the letter and hold that there is nothing on the face of the letter that requires or compels the employees to do anything. There is no coercion, threat of reprisal, or force in the letter. Neither are there any words of restraint on, or interference with, the exercise of rights of employ-

ees that are guaranteed by § 7 of the Act that can be found in the letter. There was no proof that any employee was actually coerced or compelled to do anything, nor that his rights were in any way restrained or interfered with. In this connection, the only evidence in the case relative to the letter was the letter itself and a stipulation that it was distributed to the employees by the Company.

The holding of the Board that the Company distributed the letter "for the purpose of obstructing Board investigations" is nothing but pure speculation and imagination on the part of the Board, as there is nothing in the record that supports or even tends to support such a holding.

It is well settled that the interpretation of a written instrument is a question of law to be decided by the courts. Accordingly, the interpretation and construction of such an instrument by an administrative agency, such as the Board in this case, is not binding on this court. We held in *Federal-Mogul Corp. v. N. L. R. B., supra,* at p. 1256:

"It is well settled that the interpretation of a written instrument is a question of law to be decided by the courts. While the courts may approve and adopt an interpretation of a document made by an administrative agency if found to be correct, they are not bound to do so."

The Seventh Circuit, in *N. L. R. B. v. J. W. Mortell Co.,* 440 F.2d 455 (7 Cir. 1971), held:

"It has been held by this court that the Board's construction of written documents and undisputed evidence is not binding on this court. *Celanese Corp. v. N. L. R. B.,* 291 F.[2d] 224, 226 (7th Cir. 1961)."

Also, see *N. L. R. B. v. Big Three Industrial Gas & Equipment Co.,* 441 F.2d 774 (5 Cir. 1971); *Tri-Cor, Inc. v. United States,* 458 F.2d 112, 198 Ct.Cl. 187 (1972); *Dale Ingram, Inc. v. United States,* 475 F.2d 1177, 201 Ct.Cl. 56 (1973); *H. N. Bailey & Associates v. United States,* 449 F.2d 376, 196 Ct.Cl. 166 (1971); and *Red Circle Corporation v. United States,* 398 F.2d 836, 185 Ct.Cl. 1 (1968).

We hold further that the Board's interpretation of the letter is erroneous and is not supported by substantial evidence.

■■■ The letter in question is protected free speech under the First Amendment of the Constitution. It is also protected by § 8(c) of the Act, which provides:

"The expressing of any views, arguments or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or a promise of benefit."

The distribution of the letter was a dissemination of an expression of the views and opinions of the Company regarding the fundamental rights of its employees to have an attorney present before making any statement to an investigative agent of the Government. The expression contained no threat of reprisal or force or promise of benefit. The statute provides that such an expression "shall not constitute or be evidence of an unfair labor practice." In holding otherwise, the Board violated the express and mandatory provisions of the Act.

We conclude that the letter was well within the guidelines set forth by the Supreme Court in the case of *N. L. R. B. v. Gissel Packing Co.,* 395 U.S. 575, 617–619, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969) where the court said:

"But we do note that an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board. Thus, § 8(c) (29 U.S.C. § 158(c)) merely implements the First Amendment by requiring that the expression of 'any views, argument, or opinion' shall not be 'evidence of an unfair labor practice,' so long as such expression contains 'no threat of reprisal or force of promise of benefit' in violation of § 8(a)(1)."

■■■ The Company's letter is an accurate and objective statement of the law with respect to the right to obtain counsel. The Board concedes that employees do have a right to obtain legal counsel, if they so desire, prior to talking to an agent of the Board. In *J. P. Stevens & Co. v. N. L. R. B.,* 449 F.2d 595 (4 Cir. 1971), the Fourth Circuit Court of Appeals held that an employer had the right to tell its employees the truth when it stated:

"It startles the conscience to deny an employer—no matter its historical infractions of the Act—the right to tell its employees the truth. Without conceding inappropriateness of the occasion or absence of cause here, these considerations, even if present, cannot override the stubbornness of the facts. However unbefitting, verity can never amount to illegality. Yet the Board holds just the opposite. The circumstances warranted the judgment of the employer that explanations were owing the employees and were also the entitlement of management."

The same reasoning is applicable here. Our case involves the advising of employees of one of the most treasured and sacred rights possessed by citizens of this nation. Thus we need go no further than to say that we can conceive of no circumstances where accurately informing an employee of his right to counsel could amount to an interference, restraint, or act of coercion.

In *N. L. R. B. v. J. W. Mortell,* 440 F.2d 455 (7 Cir. 1971), in a case where the company was similarly charged with having published a letter obstructing an investigation of the Board, Judge Pell stated in a concurring opinion:

"I am unable to find in the record any showing that Mortell's activities in this particular regard interfered with employees' rights nor that the General Counsel was unable fully to present the employees' case at the hearing.

\* \* \* \* \* \*

"In the absence of any showing whatsoever that the General Counsel was in fact hampered in his presentation of this case, I find no basis in this particular matter for upholding the Board's decision." 440 F.2d at 461–2.

This court finds itself in much the same position here. The letter on its face shows no tendency to interfere with, restrain, or coerce the employees, nor does the record show in any manner that the General Counsel's investigation or presentation of his case was hampered nor made more difficult as a result of this letter.

It should be emphasized that there is nothing in the letter that indicated that the Company was discouraging its employees from talking with agents of the Board nor from giving statements to them. In fact the meaning of the language used indicates the opposite. The letter assumes and indicates that the employees will talk to Board agents. It merely tells the employees they *may* ask the agent (not the Company) for an opportunity to obtain legal counsel before talking to him. Nowhere does the letter *compel* or *require* the employees to ask the agent or anyone else for such an opportunity. Neither does the letter require or compel the employees to report to or consult with the Company regarding the obtaining of counsel or any talk or interview with a Board agent. Whatever the employees might do about obtaining counsel or talking with a Board agent was entirely optional with them, and this was the clear meaning of the Company's letter.

■ Since there was nothing in the record on which the ALJ and the Board could base their decision that the distribution of the letter was a violation of § 8(a)(1) of the Act, we can only conclude that the Company's long history of opposing the Union, standing alone, was the sole basis for their decision. This conclusion is supported by the statement of the ALJ in his decision:

> "In light of all the circumstances, *including Respondent's* [*the Company's*] *pattern of unlawful conduct, as shown in this and previous cases* * * *." (Emphasis supplied).

This conclusion is also supported by the following statement of the Board in its decision:

"The General Counsel and the Charging Party [the Union] have excepted to the failure of the Administrative Law Judge to grant *a number of additional remedies.* In the light of the clear tendency of Respondent [the Company] to commit the same types of violations at each of its locations in response to organizing efforts by the Union * * * we agree [with the Union and General Counsel] that additional remedies are warranted." [10]

"Therefore, * * * we * * * shall clarify paragraph 1(c) of the recommended order to provide that Respondent shall cease and desist from informing employees that they can obtain legal counsel before talking to a Board agent, etc. * * *." (Emphasis supplied).

■ Viewed in this light, it becomes clear that the Board entered its order (that the distribution of the letter by the Company was a violation of § 8(a)(1) of the Act) for the purpose of punishing the Company because of its opposition to the Union in this and other cases. This is not permissible, and we cannot approve it. The proper role of the Board is akin to that of an impartial and neutral referee. Its orders are required to be remedial, not punitive. Many cases have so held. It is fundamental that the Board has no authority to punish a company because it is against a union. Any company has a perfect right to be opposed to a union, and such opposition is not an unfair labor practice. See *N. L. R. B. v. McGahey, supra,* at 409, where we held:

"This is not to penalize the employer because of antiunion bias for we recognize that *antiunion bias, strong convictions against unions* or opposition to the the underlying philosophy of the Labor Management Relations Act *is not itself an unfair labor practice.* In a free democracy, it is the citizen, not the Government, who fixes his own beliefs." (Emphasis supplied).

Accordingly, we hold that substantial evidence on the record as a whole does not

---

**10.** Obviously, the additional punitive orders were issued by the Board because the Union insisted on them with the support of the General Counsel.

support the order of the Board that the distribution of the letter by the Company violated § 8(a)(1) of the Act, and enforcement of that part of the order is denied.

### IV. Conclusion

It is the opinion of this court, and we hold, that substantial evidence on the record as a whole does not support the order of the Board and its enforcement is denied in its entirety.

In view of our disposition of the case, we do not reach nor decide the question raised as to the adjusted rate of interest on back pay nor the correctness of the company-wide broad form of order issued by the Board.

ENFORCEMENT IS DENIED.