Donald E. HODGES and Ricky
Mikell, Plaintiffs,

v.

John TOMBERLIN, Patrick Ward, J. B.
Rollison, Charles Phillips, Robert
Goethe, George Nichols, individually and
in their capacity as agents and employees of The Georgia Ports Authority, and
The Georgia Ports Authority, Defendants.

CV480–156.

United States District Court,
S. D. Georgia,
Savannah Division.

March 15, 1981.

Cletus W. Bergen, II, Savannah, Ga., for plaintiffs.

G. Paris Sykes, Jr., Atlanta, Ga., Fred S. Clark, Savannah, Ga., for Ga. Ports and George Nichols.

## ORDER

B. AVANT EDENFIELD, District Judge.

This case is before the Court pursuant to a complaint seeking relief under both the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Railway Labor Act, 45 U.S.C. § 151 et seq. A bench trial was held on February 4–5, 1981, at which time evidence was received relating primarily to plaintiffs' allegations that they were wrongfully terminated from their positions as crane operators at the Garden City, Georgia facility of the Georgia Ports Authority (GPA). In particular, plaintiffs alleged that the ostensible grounds for their dismissal, falsification of time records, was merely a pretext masking impermissible animus against their efforts to unionize GPA workers. Also, before the Court were related claims of conspiracy among the named defendants to effect these improper ends, and disparate treatment with respect to plaintiffs' dismissals.

After careful consideration of all appropriate evidence and argument, the Court concludes that plaintiffs have failed to establish that any impermissible motive entered the decision to terminate them. Instead, it appears to the Court that plaintiffs' dismissals were occasioned by a good faith belief that they had seriously abused company policies. It further appears to the Court that this belief was in all likelihood correct. The bases for these determinations are outlined below under the headings Findings of Fact (FF) and Conclusions of Law (CL). However, should content be at odds with these designations, content shall be controlling.

### Findings of Fact

#### The Parties:

1. The Georgia Ports Authority is a public corporation and an instrumentality of the State of Georgia which operates port, warehouse, and other facilities in the Savannah, Georgia area. Ga.Code Ann. § 98–202.

2. Plaintiff Donald E. Hodges was last hired by the GPA on September 15, 1976. During the period relevant here, Mr. Hodges worked as operator of a "Kocks crane," which is a large, highly complex and costly device used in the loading and discharge of containerized freight at the Garden City, Georgia facility of the GPA.

3. Plaintiff Ricky Mikell was hired by the GPA on September 21, 1976. Mr. Mikell was also a Kocks crane operator during the period at issue. Mr. Mikell is a close friend of plaintiff Hodges and an associate of Mr. Hodges in various activities initiated by Hodges, including the organizational efforts here under consideration.

4. The individual named defendants also are, or were, employees of GPA. Defend-

ant George Nichols is Executive Director of GPA. Defendant Robert Goethe is his deputy. Defendant Charles Phillips is GPA Personnel Manager. Defendant John Tomberlin was the immediate supervisor of the plaintiffs at the time of their dismissal. He is, however, not presently employed by GPA. Defendant Patrick Ward is manager of the GPA container port, and Mr. Tomberlin's superior. Defendant J. B. Rollison is GPA Director of Operations, and Mr. Ward's superior.

*Background Considerations*

5. Kocks cranes are operated by the GPA based upon several sets of related rules and policies. Three are of particular concern here:

(a) *Allowed Time Rules*: Kocks crane operators, who completed their work and properly signed out at 12:00 midnight or earlier, were required to report the following date at their regularly scheduled time, normally either 7:00 A.M. or 8:00 A.M. Kocks crane operators, who were required to work past midnight but not until 3:30 A.M., were not required to report for work until 1:00 P.M. the following day. In such cases, operators received pay for four hours plus whatever pay they earned during the hours they actually worked after reporting. Kocks crane operators, who worked until 3:30 A.M. or later, were not required to report to work at all the following day. They were required to call in at approximately 4:30 P.M. the next day to determine whether or not they should report that evening at approximately 6:00 P.M. Even if no work were available for the evening hours, employees were guaranteed eight hours straight-time pay for the period.

(b) *Ship Billing Procedures*: The GPA tariff provides that shipping lines who utilize the services of the Ports Authority's Kocks cranes and operators are billed in half-hour increments for any portion of a half-hour period during which cranes and operators are working on loading or unloading a ship. Shippers are also billed for an automatic half-hour after completion of the loading or unloading for the purpose of "booming up and tying down" the crane, even though the entire half-hour might not be needed for this process of placing the crane at rest. Thus, prior to December 27, 1979, crane operators had been instructed to round the time actually worked on a ship forward to the next one-half hour and automatically add an additional half-hour in order to complete the billing time recorded in the "crane log book."

(c) *Timekeeping For Pay Purposes*: Prior to December 27, 1979, Kocks crane operators had been instructed by Mr. Tomberlin to round off their own actual work time for purposes of their pay to the nearest quarter hour following the point when they actually completed their duties and were therefore ready to leave the GPA property. As an accommodation, Mr. Tomberlin permitted operators, who in fact completed work within the first fifteen minutes of a half-hour period, to remain physically present at the terminal until a full quarter-hour had passed. Operators could then round off to a half-hour and leave the GPA property, thus gaining pay for a period ending on the half-hour. Tomberlin did not permit operators to sign out in the first fifteen minutes of an hour, leave GPA property within this fifteen minute period, *and* collect pay until the half-hour. Testimony of Mr. Tomberlin and Mike Myers, Kocks crane operator.

6. During the period at issue here, as is still true presently, the GPA had a general policy preference for continuing to operate as a nonunion employer. Testimony of Mr. Nichols. It is also apparent that unionization has been a topic of active discussion for many years at the GPA. Testimony of Mr. Rollison. In particular, an election was held at GPA in 1976 with respect to organizational efforts of the International Longshoremen's Union (ILA). Testimony of Chester A. Dunham, V. P. Local 1414, ILA. However, there is no reason whatever to

conclude that the GPA resorted to any pressure or retaliation against organizers of this election effort, even with respect to GPA employee, Jack Duncan, who led this unsuccessful effort. Testimony of Mr. Duncan.

7. Other unionizing efforts were also made, particularly during the summer and fall months of 1979. Plaintiff Hodges talked to the ILA in February 1979, concerning the possibility of a new organizational drive. He was then given pledge cards for circulation among his co-workers. Mr. Mikell assisted Hodges in gaining signatures between February and June 1979. A total of about 80 cards were eventually signed through these efforts and turned over to Mr. Dunham in July 1979. Testimony of Mr. Hodges. In August 1979, a meeting was held at a park near GPA property to discuss the benefits of unionization. About 50–60 employees attended this meeting. At least one other meeting was held in September or October 1979, at the ILA union hall. However, organizational efforts largely ceased after these meetings. No election was ever conducted, even though there might have been enough cards available to call such an election. Dunham.

8. As was indicated above, plaintiff Hodges had worked for GPA for several years prior to the incident in question here. Mr. Hodges began working in September 1976, as an apprentice operator of mobile cranes. In this job he was responsible for operating and maintaining smaller GPA cranes. He was promoted to the Kocks crane, the most responsible and remunerative operator's position, in 1977 or 1978. Evaluations of Mr. Hodges' technical skill in operating the crane were generally highly favorable between 1976 and 1979. However, in 1979, after Mr. Tomberlin became his supervisor, his objective performance ratings declines from ninety or more to about seventy with a comment that he "has to improve." Plaintiff's Exhibit 11. Mr. Hodges also indicated that several incidents occurred in which Mr. Tomberlin accused him of failing to follow directions for reporting to work, calling in, and relieving other operators. Hodges. However, these disputes were resolved without recourse to formal disciplinary or grievance procedures.

Apparently, they involved only misunderstandings of work assignments, though Mr. Hodges' rather abrasive, outspoken nature probably contributed in some part to these problems. Testimony of Patrick Ward. Rollison.

9. Similarly, the evidence indicated that Mr. Mikell's performance ratings had generally been good prior to 1979, when Mr. Tomberlin became Kocks crane supervisor. Thereafter, he too experienced problems with alleged infractions of GPA policies. However, these matters were also generally resolved without recourse to formal reprimands or grievance machinery.

10. Plaintiffs have, of course, attributed these difficulties to their unionizing efforts which occurred during approximately the same time period. However, it is significant to note that Mr. Tomberlin also became their supervisor at this time, i. e., February 1979. Tomberlin. Thus, these problems can as easily be attributed to this change in supervisors. Furthermore, it should be noted that Mr. Tomberlin was not hostile to the union. Quite the opposite, he shared many of Mr. Hodges' complaints, and, in fact, signed a union card at plaintiff's request. Hodges. Thus, the Court cannot conclude that anti-union animus was the basis of Mr. Tomberlin's difficulties with the plaintiffs.

*Plaintiffs' Terminations*

11. Beginning at 6:00 P.M. on December 27, 1979, plaintiffs were assigned to work two Kocks cranes which were being used for loading and unloading the ship KISO MARU.

12. Prior to leaving work on the afternoon of December 27, 1979, Mr. Tomberlin checked with the stevedore working the KISO MARU and with the Atlantic Towing Company, the tugboat operator which was to undock or "sail" the vessel. These inquiries established that the ship would be fully loaded by approximately 12:00 midnight and that it would sail between 2:00 A.M. and 2:30 A.M. when the tide was right. Based on this information, Mr. Tomberlin concluded that plaintiffs Hodges and Mikell would complete their work well be-

fore 3:30 A.M. and therefore be able to return to work at 1:00 P.M. on December 28, 1979. Accordingly, Mr. Tomberlin told the plaintiffs on December 27, 1979, that they would be expected back the next day at 1:00 P.M. Tomberlin.

13. Crane logs establish that the loading of the KISO MARU was in fact completed at 12:00 midnight. In accord with GPA policy, the midnight to 12:30 A.M. period was billed as "booming up and tying down"· the crane. Similarly, the logs of the Atlantic Towing Company's tugboats TYBEE and LAWTON CALHOUN, which sailed the KISO MARU establish that the vessel was "broken away," or pulled, from the dock at 2:25 A.M. These logs also establish that the vessel had been turned around and headed downriver by 2:50 A.M. Plaintiff's Exhibits 9, 10. Testimony of Steven F. Brown, docking pilot, Atlantic Towing Company.

14. The Kocks cranes are very expensive and complex machinery. They are also subject to damage, were a ship to break lose from its tugs or lose power and ram back into its berth. For this reason, crane operators may, in their discretion, remain on their cranes until a ship has moved downriver past its berth, thus ending any possibility of an accident. Tomberlin.

15. With respect to the KISO MARU, some basis may have existed for plaintiffs to remain with their cranes until the vessel had passed. This ship was unusually large. There may also have been some moderate wind and rain, which would support particular caution in sailing the ship. Hodges. Nonetheless, Mr. Tomberlin hotly disputed the necessity of plaintiffs' remaining at their posts beyond 2:25 A.M. when the ship was broken away from the dock.

This Court finds it unnecessary to determine when plaintiffs should have left the cranes. Plaintiffs were not discharged for staying at their posts too long. Their problems arose, of course, from allegations concerning when they left GPA property.

16. Plaintiffs testified at length that, based upon their own watches and other time pieces they had checked during the evening, they were absolutely certain that they had left GPA property no earlier than 3:20 A.M. Thus they alleged that they were fully justified in rounding off their times to 3:30 A.M., and reporting the next day only at 6:00 P.M., if at all.

17. In support of their claims, plaintiff offered testimony from two other persons. Mr. Ralph Culbertoon, an electrician, testified that he had been on the dock around 3:00 A.M. on December 28, 1979. Mr. Culbertoon stated that he recalled looking at his watch which read "3:05" and further that he had remained on the docks, talking with the plaintiffs until perhaps 3:10 A.M. However, on cross-examination, Mr. Culbertoon indicated that his watch was accurate only within about five minutes and that a greater error was not impossible.

Mr. Steven Brown also offered testimony intended to support the plaintiffs. Mr. Brown indicated that while he was directing the sailing of the KISO MARU, he had seen lights on in plaintiffs' cranes at around 2:30 or 2:35 A.M. Mr. Brown also testified that he believed he had seen these same lights on later, after 3:00, when he was preparing to leave the KISO. However, Mr. Brown could not say with any certainty that this light came from plaintiffs' cranes and not another one which was then working a vessel in the next berth.

18. Defendants' allegation that the plaintiffs, in fact, left GPA property well before 3:30 A.M. is based primarily on a GPA gate log which listed plaintiff as having exited at 3:08 A.M. Testimony of Sadie M. Benton, GPA security gate guard. ·Plaintiffs' Exhibit 4. Ms. Benton testified in detail concerning the considerable care taken by her to insure that her watch was accurate and that proper exit times were recorded. Furthermore, testimony was received concerning two employees of Belcher Oil Company which maintains a facility at the GPA. Belcher employees had been logged into the gate at 2:53 A.M. and 3:22 A.M. These were strongly supported by Belcher time card entries which logged these employees in at 3:01 A.M. and 3:27 A.M. Belcher's facility is about three blocks from the GPA gate.

It thus appears that plaintiffs' account is directly contradicted by Ms. Benton's records, which are in turn strongly corroborated by documentary evidence from an apparently entirely disinterested source. Plaintiffs, on the other hand, have provided only vague supporting testimony to support their characterization of the time they exited. The Court must therefore conclude that the overwhelming weight of the evidence supports defendants' contention that the plaintiffs left GPA property at 3:08 A.M. At the least, this evidence well supports a good faith belief that the violations did in fact take place.

19. Mr. Tomberlin arrived at work at approximately 7:15 A.M. on December 28, 1979. He then checked the crane logs and discovered that the plaintiffs had listed 3:30 A.M. as their exit time. Mr. Tomberlin was immediately dubious of the necessity for remaining so late and suspicious that plaintiffs had tried to abuse GPA policy concerning work past 3:30 A.M. FF 5. Accordingly, he contacted Atlantic Towing and GPA security to determine when the KISO MARU had sailed. He was informed that the vessel had sailed around 2:30 A.M.

Mr. Tomberlin then called the security gate and discovered that plaintiffs were listed as having exited at 3:08 A.M. Mr. Tomberlin indicated that he checked gate times "occasionally to keep things in line." By this statement, he apparently referred to his policy of permitting operators to draw pay for a full half-hour if they remained on GPA premises until a quarter after the hour. FF 5. In this case, Mr. Tomberlin, of course, found that his largess had been abused. He decided that the plaintiffs were "just trying to make 3:30," and further that they had failed to follow his directive that they remain at least until 3:15. Mr. Tomberlin thus concluded that plaintiffs' conduct in falsifying pay records amounted to a Class A violation under GPA Rules. Class A violations are grounds for immediate termination. Defendants' Exhibit 9, at p. 30.

20. After Mr. Tomberlin had completed his investigation and determined that the plaintiffs should probably be dismissed, he discussed the situation with defendant Charles Phillips. Mr. Phillips was consulted in his role as expert advisor to supervisors with respect to personnel matters. This step was taken to confirm that the information in Mr. Tomberlin's possession did support the decision to terminate the plaintiffs. Tomberlin. Union activity was not discussed in any way. Tomberlin, Phillips.

21. Plaintiffs were officially terminated by Mr. Tomberlin on the afternoon of December 28, 1979 for falsification of time records, when they failed to provide any explanation for their apparent conduct. Thereafter, plaintiffs also consulted Mr. Phillips, who under GPA policy, has general responsibility for helping employees to present grievances to higher GPA officials. Defendants' Exhibit 9, at 25. Mr. Phillips, in fact, assisted plaintiffs in their appearances first, before Mr. Ward, and then later in other unsuccessful appeals before Mr. Rollison and finally Mr. Goethe. Mr. Phillips assisted in bringing Mr. Culbertoon to these proceedings and gave some strategic advice to plaintiffs. He did not function as their attorney, though he certainly was to some degree helpful in ways expected of an attorney. Phillips. The Court finds no basis for concluding that his efforts were not made in good faith or that a more favorable result could have been achieved had he acted differently in some way.

22. Plaintiffs have contended that GPA officials conspired to use their alleged rule violation as a pretextual basis for terminations in fact based on hostility to unionization. Defendants have uniformly denied these claims, arguing that union activity was never even discussed in connection with the incident here in issue. Plaintiffs have attempted to dispute these assurances by alleging several conversations in which one or another defendant directly or indirectly warned against union activity at the GPA or at least on GPA time. This Court is not prepared to say that such events did or did not occur. However, the Court does conclude, that even had such comments been made, they do not establish that anti-union

animus necessarily motivated plaintiffs' termination.

23. Plaintiffs have also contended that, even had they acted as alleged, the defendants were nonetheless guilty of disparate treatment in that other employees who committed similar offenses were not discharged. Evidence adduced at trial reduced this claim to the allegation that one other employee had signed in at 8:00 A.M. when logs indicated that he had in fact entered through the gates at 8:25 A.M. Hodges. Plaintiff's Exhibit 17. However, there was no showing made that GPA had discovered this violation or that it was in any way typical for such violations to occur or to be tolerated.

### Conclusions of Law

1. This Court has jurisdiction over the present action pursuant to the Railway Labor Act, 45 U.S.C. § 151 *et seq.* and 42 U.S.C. § 1983, *See* Order of December 12, 1980.

2. To recover under § 1983, plaintiffs must demonstrate that one or more of the defendants acted to deprive them of rights guaranteed under the laws and constitution of the United States and that these defendants were then operating under color of state law. *Monroe v. Papp,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). *Brown v. Miller,* 631 F.2d 408 (5th Cir. 1981). In the present case, there is no doubt that the defendants, as employees of a state agency, acted under color of state law. FF 1, 4. Similarly, there is no doubt that the GPA has consented to suit under § 1983. Ga.Code Ann. 98–202, Order of December 12, 1980. Nor is there any question that the First Amendment to the Constitution protects the right to union organization and activity. *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1944); *Lontine v. Van Cleave,* 483 F.2d 966 (10th Cir. 1973). Thus plaintiffs may recover under § 1983 if it is shown that union activity played an impermissible role in their terminations.

Similarly, the Railway Labor Act provides that:

[e]mployees shall have the right to organize and bargain collectively through representatives of their own choosing.... No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice....

45 U.S.C. § 152, Fourth. Furthermore, it is now established that this section creates a private right of action with respect to aggrieved employees. *Burke v. Compania Mexicana De Aviavan,* 433 F.2d 1031 (9th Cir. 1970). Plaintiffs may, therefore, recover under both the Railway Labor Act and § 1983 if it is established that union activity played some impermissible role in their terminations.

3. The order of proof with respect to plaintiffs' claim under the Railway Labor Act may be developed by analogy to the National Labor Relations Act, 29 U.S.C. § 141 *et seq.* Under the NLRA, once an employer has established a proper independent basis for discharge, the burden shifts to the plaintiff to establish that anti-union animus was the true reason:

> The burden of proof in a case such as this is upon the general counsel and requires that he present substantial evidence that discharge came from improper motives. Furthermore, mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence. An unlawful purpose is not lightly to be inferred. The employer does not have the burden of disproving the existence of unlawful motivation in discharging an employee.

*Florida Steel Corporation v. NLRB,* 587 F.2d 735, 742 (5th Cir. 1979) quoting *Federal-Mogal Corporation v. NLRB,* 566 F.2d 1245 (5th Cir. 1978) (citations omitted).

With respect to the § 1983 claim, the order of proof may be taken by analogy from Title XII. *Lee v. Conecuh County Board of Education,* 634 F.2d 959 (5th Cir. 1981). Thus, plaintiffs may be required to make a *prima facie* showing that they were qualified for their positions yet were terminated while others not active in organizing

efforts were retained under similar circumstances. Defendants would then have the burden of "articulating" a non-discriminatory motive. Were this established, the plaintiff would then be required to show that this reason was merely pretextual and thus, by a preponderance of the evidence, that the defendants had discriminated against them. Under § 1983 much as with the Railway Labor Act, once the employer has established a legitimate basis for terminating the plaintiffs, plaintiffs have the ultimate burden of establishing that an improper motive, in fact, led to their discharge.

■ 4. Upon review of the evidence established above, the Court concludes that, even assuming *arguendo* that plaintiffs have made out a *prima facie* showing of discrimination, the defendants have "articulated" a legitimate, non-discriminatory reason for their actions. The Court further concludes that plaintiffs have failed to rebut this showing. Quite the opposite, it is clear that the overwhelming weight of the evidence supports the defendants' position. Several facts in particular lead the Court to the view that plaintiffs have failed to establish any connection between their discharge and protected activity. First, it appears that unionization is a familiar subject of discussion at the GPA. This "threat" has existed for many years and involved some organizers apparently far more active, visible and effective than petitioners here. The fact that no evidence whatever of discrimination against these other employees was presented strongly suggests that the defendants' admitted preference for avoiding unionization has led to no policy of retaliation against such efforts. FF 6. Secondly, it appears to the Court that no immediate threat from the ILA existed when plaintiffs were terminated. Quite the opposite, the evidence suggests that organizational efforts had already run their course without visible result well before the incident which led to plaintiffs' discharge. Third, the Court finds that plaintiffs' difficulties with Mr. Tomberlin are much more readily seen as personal or strictly job-related than merely pretextual. This conclusion

is based upon Mr. Hodges' at best, somewhat abrasive character and Mr. Tomberlin's apparent support for, not opposition to, unionization of GPA employees. FF 8, 9. Fourth, I find no sound basis for questioning the good faith of the defendants in their conclusion that a serious policy violation supporting termination had been committed by the plaintiffs here. In fact, as I indicated above, the evidence is overwhelming that this belief was not merely genuine but entirely correct. FF 17.

In sum, the Court concludes that no basis exists to support a finding that anti-union animus contributed to the decision to terminate the plaintiffs. The labor history of the GPA argues strongly against any inference that personnel rules were used against employees who attempted to organize. On the other hand, the facts of this case amply support defendants' contention that plaintiffs were terminated precisely for the reasons stated, which are, of course, entirely proper. *Florida Steel Corporation v. NLRB*, 587 F.2d 735, 745 (5th Cir. 1979).

■ 5. With respect to plaintiffs' specific allegation of conspiracy to deprive them of constitutional rights and disparate treatment in the disciplinary proceeding, the court similarly finds for the defendants. The mere existence of a general anti-union bias is insufficient to support a claim of discriminatory discharge where, as here, the employer has otherwise established proper grounds for dismissal. *Florida Steel, supra.* Plaintiff has completely failed to demonstrate by inference or otherwise that anti-union biases fueled any individual conduct, much less a conspiracy to retaliate against them. FF 21. Likewise, plaintiffs' showing that one other employee may have violated company time policies without resulting reprimand fails to establish that any disparate treatment occurred here, where there was no showing that this conduct was even discovered by supervisory personnel. FF 22.

### Conclusion

For reasons outlined above, this Court finds no sound basis to support plaintiffs'

contention that they were terminated from employment based on anti-union animus. The Court further concludes that defendants have demonstrated by a preponderance of the evidence that plaintiffs were terminated in proper response to probable violations of significant company policies. In cases such as this, "an unlawful purpose is not lightly to be inferred." *NLRB v. McGahey*, 233 F.2d 406, 413 (5th Cir. 1956). Here, I find that such a motive cannot be inferred at all. The Court, therefore, orders that judgment be entered for the defendants.